**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION**

| | |
|---|---|
| **JASON MICHAEL SHARP,** ) | |
| ) | |
| **Petitioner,** ) | |
| ) | |
| **v.** ) | **Case No.: 5:17-cv-1077-AMM** |
| ) | |
| **TERRY RAYBON, Warden of** ) | |
| **William C. Holman Correctional** ) | |
| **Facility,** ) | |
| ) | |
| **Respondent.** ) | |

<u>**MEMORANDUM OPINION**</u>

Jason Michael Sharp, a convicted Alabama prisoner, petitions the court for a writ of habeas corpus under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214. Doc. 14. Mr. Sharp challenges the constitutionality of his capital conviction and death sentence in the Circuit Court of Madison County, Alabama. *See id.* at 2.

Alabama courts rejected as meritless two of the constitutional claims in Mr. Sharp's petition. Accordingly, this court cannot grant habeas relief on those claims under AEDPA unless Mr. Sharp proves that an egregious legal or factual error was integral to the state court reasoning. Mr. Sharp has not satisfied that stringent standard. For procedural reasons, Mr. Sharp cannot obtain habeas relief based on his

remaining claims. Consequently, the court **DENIES** Mr. Sharp's petition, including the requests to permit discovery and hold an evidentiary hearing.

## I.      Background

Mr. Sharp was indicted, convicted, and sentenced to death for the 1999 rape-murder of Tracy Lynn Morris. Relevant history is set forth below.

### A. The Murder

In its opinion on direct review, the Alabama Court of Criminal Appeals summarized the guilt phase evidence in this case. *Sharp v. State* ("*Sharp Direct I*"), 151 So. 3d 308, 315–17 (Ala. Crim. App. 2008), *aff'd on return to remand*, 151 So. 3d at 327–29, *aff'd in part, rev'd on other grounds sub nom. Ex parte Sharp*, 151 So. 3d 329 (Ala. 2009).

The State of Alabama's witnesses included Lynn Morris, the victim's mother; Lieutenant Jim Wynn and Investigator Kathy Pierce of the Huntsville Police Department; Nurse Kim Hellums of the Huntsville Hospital Emergency Room; Cassandra Knight, Mr. Sharp's former wife; and Chad Jenkins, one of Mr. Sharp's friends. *Id.* at 315–17. Witnesses from the Alabama Department of Forensic Sciences who testified for the State were Dr. Stephen Pustilnik, a medical examiner, and Rodger Morrison, a forensic scientist. *Id.* at 317. Dr. Ronald Acton, "an expert in DNA analysis," testified for Mr. Sharp. *Id.*

2

Ms. L. Morris testified that she and her daughter had dinner nightly before Ms. Morris's shift as a nurse began at 6:00. *Id.* at 315. In the afternoon of the murder, Ms. Morris called her mother at 3:30 "and said she was on her way out the door." *Id.* Because Ms. Morris "never showed up for dinner," Ms. L. Morris called her daughter "numerous" times. *Id.* Not receiving any return calls, Ms. L. Morris "drove to [her daughter's] house" around 5:00 p.m. *Id.* Ms. L. Morris testified that she "saw [her daughter's] vehicle in the carport[] and entered the house through the kitchen." *Id.*

Upon entry, Ms. L. Morris recalled hearing "loud[]" breathing and seeing familiar belongings, which Ms. Morris would have taken to work, "scattered about the kitchen floor." *Id.* Ms. L. Morris located Ms. Morris "lying on the floor" of her bedroom. *Id.* Her daughter's "pants were down at her ankles," "bra was around her neck and had blood on it," and hand had duct tape attached to it. *Id.* Ms. L. Morris called "her husband and emergency personnel for help." *Id.* After an ambulance transported Ms. Morris to the Huntsville Hospital Emergency Room, she died during surgery. Doc. 19-23 at 57.

Ms. L. Morris identified Mr. Sharp as the same man who had provided services to her family "approximately one year before" her daughter's murder. *Sharp*

*Direct I*, 151 So. 3d at 315. Specifically, Ms. L. Morris testified that Mr. Sharp "had washed vehicles for [the] family," including Ms. Morris. *Id.*

Lieutenant Wynn, an investigating officer, testified that he arrived at Ms. Morris's house between 5:30 p.m. and 6:00 p.m. *Id.* Because of an apparent "struggle in the kitchen," Lieutenant Wynn had the impression that "he was investigating a burglary and a rape." *Id.* Lieutenant Wynn described seeing Ms. Morris "on her back in the bedroom" with "[h]er pants and panties . . . around her knees or ankles," "bra . . . up over her breasts," chest covered "all over" in blood, and "face . . . badly beaten." *Id.* Lieutenant Wynn also described Ms. Morris's breathing as "very labored" and recalled her having "duct tape on at least one wrist." *Id.*

Nurse Hellums was one of the medical providers who examined Ms. Morris in the Huntsville Hospital Emergency Room. *Id.* at 316. Nurse Hellums testified that, despite knowing Ms. Morris, she was "not recognizable" when arriving at the hospital because her "face was so swollen." *Id.* Nurse Hellums realized eventually that the patient receiving emergency care was Ms. Morris. *Id.*

Nurse Hellums recalled seeing "a lot of dried blood on [Ms. Morris]" and "duct tape on both hands." *Id.* Nurse Hellums observed indications of "trauma[]" to Ms. Morris's "groin area." *Id.* Specifically, Nurse Hellums testified seeing "signs of swelling and bruising around the perineal and vaginal areas and on the inside of her

4

thigh." *Id.* Additionally, Nurse Hellums detected "traces of blood and what appeared to be dried semen on the inside of [Ms. Morris's] thigh area." *Id.* Nurse Hellums deduced that someone had "brutally raped" Ms. Morris. *Id.* Based on her medical experience, Nurse Hellums testified that "she had seen that degree of swelling and bruising of the vaginal area only in cases involving sexual assault." *Id.*

Investigator Pierce testified that she interviewed Mr. Sharp a few days after the murder. *Id.* During this interview, Mr. Sharp detailed his personal history with Ms. Morris. *See id.* According to Mr. Sharp, "four months before" the murder he and Ms. Morris had been sexually active and "two months before" was the last time he had spoken with her. *Id.*

Investigator Pierce recounted questioning Mr. Sharp about his activities on the day of the murder. *See id.* Mr. Sharp responded that "he worked until about 11:00 a.m.; . . . visited with some friends who processed deer until 2:00 p.m. or 2:30 p.m.; [and] . . . noticed a police vehicle near [Ms. Morris]'s neighborhood while he and his wife were driving in the area later that day . . . ." *Id.* Mr. Sharp shared with Investigator Pierce that "he asked his wife if she thought something could be wrong at [Ms. Morris's] house." *Id.* After driving by Ms. Morris's house, Mr. Sharp and his wife returned to their home where Mr. Sharp saw a televised report about the murder. *Id.* After this initial interview, "[Mr. Sharp] provided a DNA sample." *Id.*

5

Investigator Pierce stated that she scheduled a second interview "for one week later" but Mr. Sharp canceled. *Id.* A few hours before their meeting time, Mr. Sharp called Investigator Pierce and explained that "he could not come in because [he was leaving to visit] his grandmother in Tennessee [who] was having surgery." *Id.* Mr. Sharp told Investigator Pierce that he would be returning from the trip in three days. *Id.*

Investigator Pierce then visited Mr. Sharp's workplace, and Investigator Pierce then went to the house of Chad and Brad Jenkins—the friends whom Mr. Sharp mentioned in his alibi—where Investigator Pierce "saw a vehicle . . . that was registered to [Mr. Sharp]'s wife." *Id.*

Investigator Pierce returned to the friends' home a few days later to check Mr. Sharp's alibi. *Id.* Mr. Sharp's vehicle was there when she arrived. *Id.* Investigator Pierce testified that she was able to confirm that Mr. Sharp had been at his friends' house but had left. *Id.* Additionally, "she learned that [Mr. Sharp]'s father lived near[by]." *Id.*

Investigator Pierce testified that she and other officers went to the home of Mr. Sharp's father. *Id.* Standing outside the residence, the officers were able to identify noises from a "television and a clothes dryer," but "no one would answer the door." *Id.* Law enforcement decided to "contact[] [Mr. Sharp]'s father, who

allowed them to enter the house." *Id.* In searching the home, officers "located [Mr. Sharp] completely under the covers of a bed in a back bedroom" and arrested him in connection with the murder investigation. *Id.*

Ms. Knight and Mr. Sharp were married to each other when the murder occurred. *See id.* Ms. Knight testified that Mr. Sharp "came home from work between 4:00 p.m. and 5:00 p.m." on that day. *Id.* Ms. Knight recalled driving by Ms. Morris's house "later that evening" with Mr. Sharp and seeing "law enforcement vehicles in her neighborhood." *Id.* Contradicting Mr. Sharp's explanation for cancelling the second interview with Investigator Pierce, Ms. Knight stated that less than two weeks after the murder she (without Mr. Sharp) traveled to Tennessee for her (not his) grandmother's surgery. *Id.*

According to Chad Jenkins, Mr. Sharp "spent the two nights before he was arrested at" the Jenkins's home and left there on the morning of his arrest before law enforcement had arrived. *Id.* at 316–17. Chad Jenkins testified that the distance between his house and Mr. Sharp's father's place was "about one mile." *Id.* at 317. Undermining Mr. Sharp's alibi, Chad Jenkins "did not remember [Mr. Sharp's] helping" with processing deer during the month the murder occurred. *Id.*

Dr. Pustilnik testified on direct examination about the results of the autopsy he performed on Ms. Morris's body two days after the murder. *Id.* According to Dr.

Pustilnik, "multiple sharp and blunt force injuries" caused Ms. Morris's death. *Id.* Dr. Pustilnik identified injuries from "blunt force trauma" on Ms. Morris's "head, neck, left hand, ribs, and rectum." *Id.* In evaluating the scope of Ms. Morris's stab wounds, Dr. Pustilnik explained that he conducted an external and internal examination of her body. *Id.* Based on his external review, Dr. Pustilnik found "fifteen stab wounds and twelve or fourteen additional abrasions to her chest and abdominal areas." *Id.* Dr. Pustilnik explained that his internal study substantiated that Ms. Morris "had actually sustained many additional stab wounds." *Id.* Based upon his experience as a coroner, Dr. Pustilnik concluded that the source of the stab wounds was "a flathead screwdriver." *Id.*

During cross-examination, Dr. Pustilnik described seeing some rectal and two vaginal lacerations but no "signs of trauma to [Ms. Morris's] external genitalia." *Id.* When questioned about whether Ms. Morris had endured an assault "among the most dramatic" as Nurse Hellums had opined, Dr. Pustilnik responded, "Oh, heck no." *Id.* Dr. Pustilnik added that Ms. Morris "had two little lacerations but I wouldn't call that traumatic." *Id.*

On redirect examination, Dr. Pustilnik stated that Ms. Morris's "condition was consistent with some sexual assault victims he had seen." *Id.* Additionally, he acknowledged that "it was possible that lividity had obscured some of the bruising

[Nurse] Hellums had observed in the genital area." *Id.* With respect to the rectal lacerations, Dr. Pustilnik testified that they "indicat[ed] . . . penetrative trauma to the rectum . . . suffered at or near the time of [Ms. Morris's] death." *Id.* (internal quotation marks omitted). Overall, Dr. Pustilnik was unable to state "whether [Ms. Morris's] injuries were caused by consensual sexual intercourse or rape." *Id.*

Analyst Morrison testified about the DNA testing results performed at the Alabama Department of Forensic Sciences. *Id.* According to Analyst Morrison, the "semen stains from [Ms. Morris's] thigh and from the carpet [in] her bedroom matched [Mr. Sharp]'s DNA." *Id.* Although the Department's initial testing of the DNA "found in [Ms. Morris's] vagina" pointed to Mr. Sharp and another person as potential sources, Analyst Morrison clarified that the development of "newer forensic testing . . . eliminated [the other person]" and reconfirmed the connection to Mr. Sharp. *Id.*

Dr. Acton testified about his review of Analyst Morrison's DNA findings. *Id.* Dr. Acton "agreed with [Analyst] Morrison's conclusions regarding the semen stain from [Ms. Morris]'s thigh." *Id.* Although Dr. Acton acknowledged that "the DNA on the carpet . . . was consistent with [Mr. Sharp]'s DNA," he expressed a "belie[f] [that] more than one person contributed to th[at] DNA" sample. *Id.* Dr. Acton questioned the reliability of Analyst Morrison's DNA findings with respect to the

vaginal sample. *Id.* Dr. Acton added that the level of Analyst Morrison's training would not satisfy the criteria necessary to "qualif[y] as an expert in the field of DNA analysis." *Id.*

## B. Pretrial Procedure

A series of Madison County Grand Jury indictments, Doc. 19-21 at 24, 84, 145, several changes in counsel, and over five years' worth of procedural history in the Alabama courts predated Mr. Sharp's capital trial, *Sharp Direct I*, 151 So. 3d at 312–14. In the operative May 2005 reindictment, the grand jury charged Mr. Sharp on one count of murder during rape in the first degree. Doc. 19-21 at 145–46.

At his August 2006 arraignment, Mr. Sharp pleaded not guilty. Doc. 19-10 at 9–11; Doc. 19-23 at 43. J. Barry Abston and D. Alan Mann defended Mr. Sharp at this arraignment, and these attorneys continued to represent him through trial. Doc. 19-10 at 10; Doc. 19-21 at 178; Doc. 19-23 at 43, 56, 63–64.

## C. Trial Procedure

Beginning on August 21, 2006, Mr. Sharp was tried on one count of capital murder under Alabama Code § 13A–5–40(a)(3). Doc. 19-23 at 43, 56. This statute makes intentional murder capital under Alabama law when the defendant kills the victim "during a rape in the first or second degree or an attempt thereof." Ala. Code § 13A–5–40(a)(3).

The jury convicted Mr. Sharp of the capital charge. *Sharp Direct I*, 151 So. 3d at 312; Doc. 19-23 at 42. In the penalty phase, the jury considered evidence and arguments regarding a recommended sentence.

To support the case for death, the State relied on the jury's guilt-phase conviction as an aggravating circumstance under Alabama Code § 13A–5–49(4). Doc. 19-23 at 58. The State called two witnesses—Ralph Morris, Ms. Morris's father, and Investigator Pierce—to prove that Mr. Sharp's crime "was especially heinous, atrocious or cruel as compared to other capital offenses" under Alabama Code § 13A–5–49(8). Doc. 19-23 at 58 (emphasis omitted); Doc. 19-19 at 57, 59, 61–62.

Mr. Sharp's mitigation case included testimony from his stepmother, Diane Sharp; his older sister, Kimberly Sharp; a mitigation specialist, Joanne Terrell; and a licensed psychologist, Dr. Frankie Preston. Doc. 19-19 at 67, 81, 94; Doc. 19-20 at 1–2, 21–22. The jury returned an advisory verdict of capital punishment; eleven out of the twelve jurors voted in a favor of the death penalty. *Sharp Direct I*, 151 So. 3d at 312; Doc. 19-23 at 45.

## D. Sentencing

On September 14, 2006, the trial court conducted a separate sentencing hearing. Doc. 19-23 at 56. The Madison County Office of the State Department of

Probation prepared a pre-sentence investigative report beforehand. *Id.* at 50–57. The court shared that document with counsel, asked for feedback on "additions or corrections," incorporated a requested change, and "made [the report] a part of the record." *Id.* at 57. Neither Mr. Sharp nor the State offered additional penalty-phase evidence.

Ultimately, "[t]he trial court accepted the jury's recommendation and sentenced [Mr. Sharp] to death." *Sharp Direct I*, 151 So. 3d at 312; Doc. 19-23 at 56–61. As the court explained the aggravating evidence in the sentencing order, two circumstances existed beyond a reasonable doubt: Mr. Sharp committed the capital offense "while [he] was engaged in the commission of a rape in the first degree," and Mr. Sharp's capital crime "was especially heinous, atrocious or cruel as compared to other[s]." Doc. 19-23 at 58 (emphasis omitted).

The jury's guilt-phase conviction established the first aggravating factor. *Id.* As support for the second circumstance, the court found that Ms. Morris "was alone and defenseless in her own home," "posed no physical threat to [Mr. Sharp]," and experienced "great fear and extreme pain and mental anguish prior to the infliction of the injuries, which ultimately caused her death." *Id.* at 58–59. Referencing Ms. Morris's multiple stab wounds from a screwdriver, the court determined that her death "did not occur quickly and mercifully." *Id.* at 59. Instead, and "without

reservation," the court determined that Mr. Sharp's conduct "was extremely wicked, shockingly evil, hideously vile and cruel," and "utter[ly] indifferen[t] to the suffering of Ms. Morris." *Id.*

The court continued that "the condition of Ms. Morris" and "the disarray of various areas of [her] home[] show[ed] . . . an extremely violent, cruel[,] and tortuous" murder had occurred. *Id.* Describing her compromised physical state, the court pointed to Ms. Morris's defensive wounds, which revealed that "she tried to fight off her attacker;" wrists restrained with duct tape; "clothes pulled down to her feet and up around her neck"; "thirty-seven puncture wounds . . . on . . . her torso and body"; and bone-exposing damage to her ear from the twisting force of a screwdriver. *Id.* Based on this evidence, the court reached "the inescapable conclusion that [Ms. Morris] was aware of what was happening to her at the hands of [Mr. Sharp], a man she had known and trusted." *Id.*

On the mitigating side, the court found that Mr. Sharp "ha[d] no significant history of prior criminal activity." *Id.* at 60 (emphasis omitted). The court rejected mitigation based on Mr. Sharp's age of twenty-two years when he raped and murdered Ms. Morris because the court found that Mr. Sharp's age was "sufficient" for "understand[ing] the consequences of one's actions." *Id.*

Regarding non-statutory mitigation, the court considered information about Mr. Sharp's childhood. *Id.* Based on penalty-phase testimony from Mr. Sharp's stepmother and sister, Mr. Sharp established that his mother had "essentially abandoned," neglected, and abused him, and Mr. Sharp's mother's boyfriends and husbands abused him. *Id.* Other mitigating circumstances were Mr. Sharp's marriage to Ms. Knight and role as a father of their two-year old daughter. *Id.*

The court concluded that "the aggravating circumstances . . . clearly outweigh[ed] any mitigating circumstances" and found that accepting all of Mr. Sharp's alleged mitigation as proven would not alter this finding. *Id.*

Over two years later—in the Order on Remand with Instructions—the trial court amended the initial sentencing order to comply with Alabama Code § 13A–5– 47(d). Doc. 36-1 at 2. That provision, the substance of which appears presently in Section 13A–5–47(b), required the court to make specific evidentiary findings on the existence of enumerated aggravating and mitigating circumstances based on the trial, sentencing hearing, pre-sentence investigative report, and submissions underlying that report. *Compare* Ala. Code § 13A–5–47(d) (amended 2017), *with* Ala. Code § 13A–5–47(b). In the amended sentencing order, the court listed eight of the ten aggravating subparts recognized in Section 13A–5–49, which it had not discussed in the first order. Doc. 36-1 at 2–4. For these categories, the court

concluded that the State had not presented and the record did not otherwise contain evidence to support them. *Id.* In the mitigation section, the court listed five of the seven subparts of statutory circumstances recognized in Section 13A–5–51, but omitted in the initial order. *Id.* at 5–7. For four of these categories, the court determined that Mr. Sharp had not presented and the record did not otherwise reflect evidence to support them. *Id.* at 5–6.

For Section 13A–5–51(6)—mitigation based on Mr. Sharp's mental health— the court referred to evidence from experts—for the State and independent—who had examined him pretrial. Doc. 36-1 at 6. The court found that none of the experts found that Mr. Sharp lacked the mental capacity "to appreciate the criminality of his conduct" or suffered from a "substantial[] impair[ment]," which prevented him from "conform[ing] his conduct to the requirements of law." *Id.* (cleaned up). Thus the court determined Mr. Sharp had not presented and the record did not otherwise reflect evidence to support that mitigating circumstance. *Id.*

Turning to non-statutory mitigation, the court found that Mr. Sharp had "neither offered nor presented any other evidence of mitigating circumstances[,] . . . additional circumstances, or any other relevant mitigating circumstances" beyond those described in the first order. *Id.* Likewise, the court concluded that the evidence in the record did not establish mitigating areas beyond those circumstances credited

15

in the initial findings. *Id.* at 6–7. Overall, these amendments clarified, but did not change, the sentencing outcome. *See id.* at 7.

### E. Subsequent Proceedings

After his conviction and sentence, Mr. Sharp's case was before the Alabama appellate courts three times—twice on direct review, and once on collateral appeal from the dismissal of his postconviction petition.

#### 1. The Direct Appeals

Mr. Sharp's direct appeal proceedings lasted over five years and resulted in multi-level remand orders. Cecilia A. Pope represented Mr. Sharp in his initial appeal. Doc. 19-44 at 2. Bryan A. Stevenson and Randall Susskind of the Equal Justice Initiative became co-counsel later in the proceedings. Doc. 19-49 at 3.

In Mr. Sharp's first direct challenge, the Alabama Court of Criminal Appeals "remanded th[e] case for the trial court to amend its sentencing order," *Sharp Direct I*, 151 So. 3d at 326, and affirmed the modified judgment—the Order on Remand with Instructions—discussed in the above sentencing section, *Sharp v. State* ("*Sharp Direct II*"), 151 So. 3d 327, 327–29 (Ala. Crim App. 2008); Doc. 19-48 at 3. Mr. Sharp sought certiorari review of the appellate court's affirmance in *Sharp Direct II*. Doc. 19-45 at 2. Mr. Sharp asserted in that petition, for the first time, that the State had used peremptory strikes against Black prospective jurors in violation of *Batson*

16

*v. Kentucky*, 476 U.S. 79 (1986). Doc. 19-45 at 3, 8–17. The Alabama Supreme Court granted certiorari review of the *Batson* contention. Doc. 19-45 at 165.

On review for plain error under Alabama Appellate Procedure Rule 45A, the Alabama Supreme Court concluded that the record supported "an inference of discrimination on the part of the State." Doc. 19-48 at 3 (cleaned up). Additionally, the state supreme court remanded the *Batson* claim because it required additional development to perform a proper constitutional analysis. *Ex parte Sharp*, 151 So. 3d at 342; Doc. 19-48 at 3–4. The Court of Criminal Appeals, in turn, remanded the case for the trial court "to determine whether the State's reasons for using its peremptory challenges against African–American veniremembers were race neutral." *Sharp v. State* ("*Sharp Direct III*"), 151 So. 3d 342, 346 (Ala. Crim. App. 2010); Doc. 19-48 at 4.

After a *Batson* hearing, the trial court rejected Mr. Sharp's challenge, and he appealed. Doc. 19-48 at 4–5; Doc. 19-47 at 2–4. Temporarily, the Alabama Court of Criminal Appeals agreed with Mr. Sharp on his second appeal and ordered a new trial because of a *Batson* violation. Doc. 19-47 at 124–70. But on rehearing, that court withdrew its earlier opinion and affirmed the trial court's *Batson* decision. Doc. 19-48 at 2–100 ("*Sharp Direct IV*").

17

The Alabama Supreme Court vacated that affirmance and remanded the *Batson* claim again for additional development. Doc. 19-49 at 2. In that remand, the state supreme court ordered the Alabama Court of Criminal Appeals to "allow the parties to brief the issues raised by the trial court's *Batson* order" and "then address those issues" in a new opinion. *Id.* After supplemental briefing, the Court of Criminal Appeals upheld the trial court's *Batson* judgment a second time. *Sharp v. State* ("*Sharp Direct V*"), 151 So. 3d 346, 346 n.1, 371 (Ala. Crim. App. 2013). Following that affirmance, the Alabama Supreme Court and United States Supreme Court denied certiorari review. Doc. 19-50 at 133; Doc. 19-51 at 210; *Sharp v. Alabama*, 572 U.S. 1047 (2014).

Mr. Sharp's *Batson* claim is the only claim from his direct appeal proceedings that he pursues on habeas review. *See* Doc. 14 at 9–102.

### 2. The Rule 32 Petition

After losing on direct appeal, Mr. Sharp petitioned the Madison County Circuit Court for collateral relief under Alabama Criminal Procedure Rule 32. Doc. 19-52 at 6. Mr. Sharp amended his Rule 32 petition once, *id.* at 124–58, and the circuit court dismissed that pleading without an evidentiary hearing, Doc. 19-53 at 78–93. The Alabama Court of Criminal Appeals affirmed, Doc. 19-55 at 47–92, and

denied rehearing, *id.* at 93. The Alabama Supreme Court denied certiorari review. *Id.* at 190.

The only claim from Mr. Sharp's state collateral proceedings that he reasserts on habeas review is his claim for ineffective assistance of trial counsel based on the failure to present mitigating evidence of his good behavior in prison. *See* Doc. 14 at 113–15.

### 3. The Habeas Petition

After completion of the state collateral review process, Mr. Sharp petitioned this court for habeas relief and has amended that pleading once. Docs. 1, 14. Appointed counsel, Mr. John Palombi and Mr. Spencer Jay Hahn, both Federal Defenders in the Middle District of Alabama, and volunteer counsel, Mr. W. Patton Hahn of Baker Donelson, represent Mr. Sharp on habeas review. *See* Docs. 3, 5.

In his amended Section 2254 petition, Mr. Sharp has requested a discovery period and an evidentiary hearing. Doc. 14 at 115–16. Warden Terry Raybon has answered Mr. Sharp's operative petition and filed an opposing brief. Docs. 21, 22. Mr. Sharp replied. Doc. 27.

### II.    Legal Standards

Section 2254 governs Mr. Sharp's habeas action. *See Guzman v. Sec'y, Fla. Dep't of Corr.*, 663 F.3d 1336, 1345 (11th Cir. 2011). Under Section 2254(a), a

federal district court is prohibited from entertaining a petition for a writ of habeas corpus on "behalf of a person in custody pursuant to the judgment of a State court" unless the petitioner alleges "he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Claims of "an alleged defect in a [state] collateral proceeding" or claims related to a "state's interpretation of its own laws or rules" are not a basis for federal habeas relief under Section 2254. *Alston v. Dep't of Corr.*, 610 F.3d 1318, 1325–26 (11th Cir. 2010) (cleaned up).

## A. Exhaustion of State Court Remedies

A habeas petitioner must present his federal claims to the state court and exhaust all the procedures available before seeking relief in federal court. 28 U.S.C. § 2254(b)(1)(A); *Medellin v. Dretke*, 544 U.S. 660, 666 (2005). "'State prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process,' including review by the state's court of last resort, even if review in that court is discretionary." *Pruitt v. Jones*, 348 F.3d 1355, 1358–59 (11th Cir. 2003) (cleaned up) (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)).

"[T]o exhaust state remedies fully the petitioner must make the state court aware that the claims asserted present federal constitutional issues. 'It is not enough that all the facts necessary to support the federal claim were before the state courts

or that a somewhat similar state-law claim was made.'" *Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998) (quoting *Anderson v. Harless*, 459 U.S. 4, 6 (1982)). "The ground relied upon must be presented face-up and squarely; the federal question must be plainly defined." *Kelley v. Sec'y for Dep't of Corr.*, 377 F.3d 1317, 1345 (11th Cir. 2004) (cleaned up). "[A]n issue is exhausted if the reasonable reader would understand the claim's particular legal basis and specific factual foundation to be the same as it was presented in state court." *Pope v. Sec'y for Dep't of Corr.*, 680 F.3d 1271, 1286 (11th Cir. 2012) (cleaned up).

## B. The Procedural Default Doctrine

The procedural default doctrine dictates certain circumstances when the court must dismiss a habeas petition without reaching its substance. If a petitioner fails to raise his federal claim in state court at the time and in the manner dictated by the state's procedural rules, the state court can decide the claim is not entitled to a review on the merits. *Mason v. Allen*, 605 F.3d 1114, 1119 (11th Cir. 2010). In turn, "a state court's rejection of a petitioner's constitutional claim on state procedural grounds will generally preclude any subsequent federal habeas review of that claim," so long as "the state procedural ruling rests upon adequate and independent state grounds." *Ward v. Hall*, 592 F.3d 1144, 1156 (11th Cir. 2010) (cleaned up).

A procedural default may also occur when a federal petitioner's claim is unexhausted. In that circumstance, a district court will ordinarily dismiss it without prejudice or stay the cause of action to allow the petitioner to first avail himself of his state remedies. *See Rose v. Lundy*, 455 U.S. 509, 519–20 (1982). "[I]f it is clear from state law that any future attempts at exhaustion [in state court] would be futile" under the state's own procedural rules, a court can simply find that the claim is "procedurally defaulted, even absent a state court determination to that effect." *Bailey v. Nagle*, 172 F.3d 1299, 1305 (11th Cir. 1999).

### C. Overcoming Procedural Default – Cause & Prejudice

The "cause and prejudice" exception excuses procedural default when a petitioner can prove both "cause for the default and prejudice attributable thereto." *Coleman v. Thompson*, 501 U.S. 722, 749–50 (1991) (cleaned up). To show cause, a petitioner must prove "that some objective factor external to the defense impeded counsel's efforts" to raise the claim previously. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). A non-exhaustive list of factors that may constitute cause includes "a showing that the factual or legal basis for a claim was not reasonably available to counsel," "some interference by officials . . . [that] made compliance impracticable," and constitutionally "ineffective assistance of counsel." *Id.*

To show prejudice, a habeas petitioner must demonstrate "not merely that the errors . . . created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis omitted). In the context of a defaulted claim of ineffective assistance of trial counsel, a petitioner must show not only "cause," but also "that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Martinez v. Ryan*, 566 U.S. 1, 14 (2012).

## D. AEDPA

"AEDPA imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Guzman*, 663 F.3d at 1345 (cleaned up). To grant habeas relief, this court must find not only that the constitutional claims are meritorious, but also that the state court's resolution of those claims:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2); *see also Boyd v. Allen*, 592 F.3d 1274, 1292 (11th Cir. 2010).

### E. Burden of Proof & Heightened Pleading Standards for Habeas Review

The petitioner bears the burden to establish that an issue falls within Section 2254(d)(1) or (d)(2). *See Woodford v. Visciotti*, 537 U.S. 19, 25 (2002). "[T]he 'contrary to' and 'unreasonable application' clauses are interpreted as independent statutory modes of analysis." *Alderman v. Terry*, 468 F.3d 775, 791 (11th Cir. 2006). A state court's decision is contrary to "clearly established precedents [of the Supreme Court of the United States] if it applies a rule that contradicts the governing law set forth in [the Court's] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of th[e] Court but reaches a different result." *Brown v. Payton*, 544 U.S. 133, 141 (2005).

To determine whether a state court's decision is an "unreasonable application" of clearly established federal law, "[t]he pivotal question is whether the state court's application of the [relevant constitutional] standard was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). "For purposes of [Section] 2254(d)(1), 'an unreasonable application of federal law is different from an incorrect application of

federal law.'" *Id.* (emphasis omitted) (quoting *Williams v. Taylor*, 529 U.S. 362, 410 (2000)). "A state court must be granted a deference and latitude that are not in operation when the case involves review under [the relevant constitutional] standard itself." *Id.* "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.* (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Id.* (cleaned up).

Whether a state court's application of federal law was unreasonable involves "a substantially higher threshold" than a correctness threshold. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). "Ultimately, before a federal court may grant habeas relief . . . , 'a state prisoner must show that the state court's ruling on the claim . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Guzman*, 663 F.3d at 1346 (quoting *Harrington*, 562 U.S. at 103). "If this standard is difficult to meet, that is because it was meant to be." *Harrington*, 562 U.S. at 102.

Section 2254(d)(2) governs federal review of state court findings of fact underlying a conviction or sentence. "[W]hether a state court errs in determining the facts [under AEDPA] is a different question from whether it errs in applying the

25

law." *Rice v. Collins*, 546 U.S. 333, 342 (2006). Section 2254(d)(2) limits the availability of federal habeas relief due to factual error unless a petitioner can show a state court relied on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" to deny the claim under 28 U.S.C. § 2254(d)(2).

This means that a petitioner may obtain habeas relief by challenging the state court factual findings underlying an adjudicated constitutional claim as unreasonably in conflict with the evidentiary record. *See Wood v. Allen*, 558 U.S. 290, 293 (2010). But "a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Id.* at 301. Therefore, "even if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination.'" *Id.* (quoting *Rice*, 546 U.S. at 341–42). Conversely, "when a state court's adjudication of a habeas claim results in a decision that is based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding, [a federal] [c]ourt is not bound to defer to unreasonably-found facts or to the legal conclusions that flow from them." *Adkins v. Warden, Holman Corr. Facility*, 710 F.3d 1241, 1249 (11th Cir. 2013) (cleaned up).

Additionally, a state court's factual determinations are presumptively correct under Section 2254(e)(1), and "the petitioner must rebut 'the presumption of correctness by clear and convincing evidence.'" *Ward*, 592 F.3d at 1155–56 (quoting 28 U.S.C. § 2254(e)(1)) (cleaned up). "Clear and convincing evidence entails proof that a claim is highly probable, a standard requiring more than a preponderance of the evidence but less than proof beyond a reasonable doubt." *Ward*, 592 F.3d at 1177 (cleaned up). The Supreme Court has not addressed the exact relationship between Sections 2254(e)(1) and 2254(d)(2). *Wood*, 558 U.S. at 293, 304–05 ("[W]e leave for another day the questions of how and when [Section] 2254(e)(1) applies in challenges to a state court's factual determinations under [Section] 2254(d)(2).").

Finally, "the petition must 'specify all the grounds for relief available to the petitioner' and 'state the facts supporting each ground.'" *Mayle v. Felix*, 545 U.S. 644, 655 (2005) (quoting Rules Governing § 2254 Cases, Rule 2(c)). The burden of proof is on the petitioner "to establish his right to habeas relief" by "prov[ing] all facts necessary to show a constitutional violation." *Blankenship v. Hall*, 542 F.3d 1253, 1270 (11th Cir. 2008).

## F. Claims of Ineffective Assistance of Counsel

"[T]he Constitution guarantees criminal defendants only a fair trial and a competent attorney. It does not insure that defense counsel will recognize and raise

every conceivable constitutional claim." *Engle v. Isaac*, 456 U.S. 107, 134 (1982).

"The benchmark for judging any claim of ineffectiveness must be whether counsel's

conduct so undermined the proper functioning of the adversarial process that the trial

cannot be relied on as having produced a just result." *Strickland v. Washington*, 466

U.S. 668, 686 (1984). "[T]he ultimate focus of inquiry must be on the fundamental

fairness of the proceeding whose result is being challenged." *Id.* at 696.

"*Strickland* . . . provides the standard for inadequate assistance of counsel

under the Sixth Amendment." *Premo v. Moore*, 562 U.S. 115, 118 (2011). *Strickland*

states:

> A convicted defendant's claim that counsel's assistance
> was so defective as to require reversal of a conviction or
> death sentence has two components. First, the defendant
> must show that counsel's performance was deficient. . . .
>
> Second, the defendant must show that the deficient
> performance prejudiced the defense. . . . Unless a
> defendant makes both showings, it cannot be said that the
> conviction or death sentence resulted from a breakdown in
> the adversary process that renders the result unreliable.

466 U.S. at 687. "Surmounting *Stickland*'s high bar is never an easy task." *Padilla*

*v. Kentucky*, 559 U.S. 356, 371 (2010).

Regarding the first part of *Strickland*, "the proper standard for attorney

performance is that of reasonably effective assistance," and "the defendant must

28

show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687–88. "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.* at 688. The court should consider "all the circumstances," and "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.* at 688–89. This part is only satisfied when "the identified acts or omissions were outside the wide range of professionally competent assistance," and "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690.

Regarding the second part, "actual ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice." *Id.* at 693. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. The appropriate inquiry is as follows:

29

> When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt. When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.

*Id.* at 695. In making this evaluation, the court "must consider the totality of the evidence before the judge or jury." *Id.*

"Establishing that a state court's application of *Strickland* was unreasonable under [Section] 2254(d) is all the more difficult." *Harrington*, 562 U.S. at 105. In applying the *Strickland* standard, the court must also account for the AEDPA overlay, and "[e]stablishing deficient performance under *Strickland* has this same high bar under AEDPA deference." *Mungin v. Sec'y, Fla. Dep't of Corr.*, 89 F.4th 1308, 1317 (11th Cir. 2024). The interplay between *Strickland* and Section 2254(d) results in "double deference" on federal habeas review, which "is doubly difficult for a petitioner to overcome." *Johnson v. Sec'y, Dep't of Corr.*, 643 F.3d 907, 911 (11th Cir. 2011).

"The *Strickland* standard is a general one, so the range of reasonable applications is substantial." *Harrington*, 562 U.S. at 105. "When [Section] 2254(d) applies, the question is not whether counsel's actions were reasonable. . . . [but]

whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

## III.   Analysis of Mr. Sharp's Claims

This court addresses the claims in the order that Mr. Sharp presents them in his petition.

### A. *Batson* Claim

Mr. Sharp argues that "[t]he State's use of peremptory strikes to remove 11 of 14 [or 78.6 percent of] black potential jurors . . . necessitate[es] the reversal of [his] conviction and sentence." Doc. 14 at 9.

*Relevant Background*

Although *Batson* involved a Black defendant challenging the removal of potential Black jurors, the Supreme Court clarified in *Powers v. Ohio*, 499 U.S. 400, 402, 415 (1991), that the relevant rights are those of the deselected minority. Consequently, Mr. Sharp (who is white) may assert a *Batson* claim about Black venire members. *See id.* at 415; *Sharp Direct V*, 151 So. 3d at 348 n.3.

Eighty prospective jurors comprised the venire. *Sharp Direct V*, 151 So. 3d at 347. After the trial court excused nine individuals for cause, the panel included seventy-one members. *Id.* Fourteen, or 19.72 percent, of the panel members were Black; 57, or 80.28 percent, white. *Id.* The government used eleven of thirty, or 36.67

percent, of its peremptory strikes to remove Black members of the venire; the defense used two of twenty-nine, or 6.9 percent, of its peremptory allotment to strike Black members of the venire, leaving only one Black juror out of twelve who served. *Id.* at 347–48. The two alternate jurors were each party's last strike. *Id.*

Mr. Sharp raised the *Batson* issue on direct review. *See id.* at 346–47. After additional development of the claim, including a *Batson* hearing and supplemental briefing, the Alabama Court of Criminal Appeals affirmed the denial of *Batson* relief in *Sharp Direct V*. *Id.* at 371. Because *Sharp Direct V* is the last reasoned decision on the *Batson* issue in state court, that is the relevant opinion to consider under AEDPA. The court first reviews general *Batson* principles.

*Batson Framework*

Under the *Batson* three-part framework, "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Purkett v. Elem*, 514 U.S. 765, 768 (1995). In the first step, "the defendant must make out a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Johnson v. California*, 545 U.S. 162, 168 (2005) (cleaned up).

Only if a defendant satisfies that inference requirement does the second-stage "burden [of production] shift[] to the State to explain adequately the racial exclusion

by offering permissible race-neutral justifications for the strikes." *Id.* (cleaned up). Here, the plausibility of the justification does not matter, and "[u]nless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Purkett*, 514 U.S. at 768 (cleaned up).

In the third step, "the trial court must determine whether the defendant has shown purposeful discrimination" based on "the parties' submissions." *Miller-El v. Cockrell*, 537 U.S. 322, 328–29 (2003). "[T]he critical question [in this last stage] . . . is the persuasiveness of the prosecutor's justification for his peremptory strike." *Id.* at 338–39. Factors for making that credibility determination include "the prosecutor's demeanor; . . . how reasonable, or how improbable, the explanations are; and . . . whether the proffered rationale has some basis in accepted trial strategy." *Id.* at 339.

Regarding the first factor for measuring credibility, "evaluation of the prosecutor's state of mind based on demeanor and credibility lies peculiarly within a trial judge's province." *Id.* (cleaned up). Concerning the second factor, "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Purkett*, 514 U.S. at 768.

The Alabama Supreme Court concluded that Mr. Sharp satisfied the inference requirement. *Ex parte Sharp*, 151 So. 3d at 341–42. After an evidentiary hearing on

remand, the trial court found that "the State provided facially race-neutral reasons for striking the 11 African-American jurors and . . . therefore satisfied . . . step two of the *Batson* process." *Sharp Direct V*, 151 So. 3d at 359. The Alabama Court of Criminal Appeals agreed. *Id.* Mr. Sharp does not challenge the prosecutor's justifications as explicitly racial; he contends that they are not credible and a pretext for race discrimination. *See* Doc. 14 at 9–102. Consequently, the assessment by the Court of Criminal Appeals of the third step in *Sharp Direct V* is the focus of Mr. Sharp's habeas claim.

*Section 2254(d)(1) Analysis*

On habeas review, Mr. Sharp contends that the Court of Criminal Appeals evaluated purposeful discrimination unreasonably under (d)(1) and (d)(2). Doc. 14 at 10, 12 ¶ 48; Doc. 27 at 2, 7, 11. Mr. Sharp's central criticism is that the Court of Criminal Appeals relied on *Martin v. State*, 62 So. 3d 1050 (Ala. Crim. App. 2010), and that reliance "contravenes *Batson*." Doc. 27 at 4; *id.* at 3 n.6, 11; Doc. 14 at 13–14 ¶ 54. In *Martin*, the Court of Criminal Appeals observed that "[i]t is well settled that '[a]s long as one reason given by the prosecutor for the strike of a potential juror is sufficiently race-neutral, a determination concerning any other reason given need not be made.'" 62 So. 3d at 1059 (quoting *Johnson v. State*, 648 So. 2d 629, 632 (Ala. Crim. App. 1994)). But the *Martin* court did not apply this principle and instead

analyzed "all five reasons" the prosecutor gave for the challenged strike and concluded that the explanations "were race neutral and . . . no[t] . . . pretextual." *Id.* at 1060.

In Mr. Sharp's case, the Court of Criminal Appeals cited and applied *Martin*'s "one-neutral-reason" rule. *Sharp Direct V*, 151 So. 3d at 359, 364–65 & n.6, 369 & n.12. That court observed that "the prosecution offered multiple reasons in support of its strikes of the jurors in question (Jurors no. 55, 37, 65, 39, 52, 27, 11, 64, 38, 47, and 74)." *Sharp Direct V*, 151 So. 3d at 364. The court recognized that Mr. Sharp had "attack[ed] many of the prosecution's stated reasons for striking those jurors." *Id.* The court emphasized that, based on the strength of his contentions, Mr. Sharp had "offered reasons arguably demonstrating that *one or more* of the prosecution's stated reasons for striking that juror could be viewed as a sham or a pretext." *Id.* However, the court did not find that record of pretextual circumstances to be dispositive of *Batson*'s third step. *Id.* at 364–65. Instead, the court concluded that because Mr. Sharp failed to "demonstrate[], as to any individual juror in question, that *all* the stated reasons for striking that juror were a sham or a pretext," he had not shown purposeful discrimination with any strike. *Id.* at 365.

The Court of Criminal Appeals did not use the term "dual motivation" to analyze Mr. Sharp's *Batson* challenge in *Sharp Direct V*. Still, that court's

determination that Mr. Sharp had shown pretext in one or more of the prosecutor's explanations for each strike resembles that alternative approach to evaluating third-step *Batson* claims described in the pre-AEDPA case *Wallace v. Morrison*, 87 F.3d 1271 (11th Cir. 1996).

In *Wallace*, the Eleventh Circuit held that "dual motivation analysis determines whether a strike exercised for both racial and race neutral reasons violates *Batson*." *Id.* at 1274. The *Wallace* court explained the dual motivation issue in this way: "The district court found that, although the trial court did not explicitly apply dual motivation analysis to [the petitioner]'s *Batson* claim, the trial court asked and decided the dispositive question in dual-motivation analysis: would the prosecutor have exercised each challenged peremptory strike solely for his proffered race-neutral reasons?" *Id.* at 1275. The district court in *Wallace* determined, based on the state court transcript, "that the prosecutor in effect stated-and that the trial court in effect found-that the prosecutor would have exercised the same peremptory strikes even if he had not considered race." *Id.*

The Eleventh Circuit concluded that "[b]ecause the prosecutor would have exercised the peremptory strikes solely for race-neutral reasons, the district court correctly held, under dual-motivation analysis, that the State did not violate [the petitioner's] equal protection rights under *Batson*." *Id.*

36

Mr. Sharp acknowledges that "[t]he Eleventh Circuit has not opined on the correctness of [the one-neutral-reason rule]." Doc. 27 at 3. Likewise, Mr. Sharp does not identify any Supreme Court authority which has rejected that type of *Batson* application. *See* Docs. 14, 27. Still, according to Mr. Sharp, the Court of Criminal Appeals should not have evaluated his claim under the approach referred to in *Martin* because that interpretation of *Batson* is inconsistent with the opinion's "'totality of the circumstances' requirement." Doc. 27 at 3. Mr. Sharp cites *McGahee v. Alabama Department of Corrections*, 560 F.3d 1252 (11th Cir. 2009). Doc. 27 at 3. In *McGahee*, the Eleventh Circuit concluded that the Alabama Court of Criminal Appeals had applied *Batson* unreasonably, considered the claim *de novo*, and reversed the district court judgment denying habeas relief. *McGahee*, 560 F.3d at 1265–66, 1270.

But Mr. Sharp does not explain how *McGahee* satisfies his (d)(1) burden when Section 2254(d) limits "the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412; *cf. Sharp Direct V*, 151 So. 3d at 364 n.6 (noting that *McGahee*—unlike Supreme Court precedent—is not binding on Alabama courts).

In any event, Mr. Sharp relies on *McGahee* to support the argument that accepting a sufficiently race neutral reason without analyzing other explanations for

a challenged strike is an unreasonable application of *Batson*. Doc. 27 at 3. Unlike Mr. Sharp's capital trial, *McGahee* involved a Black petitioner convicted by "an all-white jury in a county which was fifty-five percent African-American." 560 F.3d at 1267.[1]

Regardless, *McGahee* does not support Mr. Sharp's position or otherwise establish an unreasonable application in the denial of his *Batson* challenge. In *McGahee*, the Eleventh Circuit determined that the omission of "crucial facts" briefed, but not analyzed, under step three of a *Batson* analysis meant that the state appellate court "did not review 'all relevant circumstances' as required by *Batson*." 560 F.3d at 1263. The first omission was the failure of the Court of Criminal Appeals "to consider the State's articulation of an explicitly racial reason for striking [a juror]" after determining that one explanation was "totally insufficient" and accepting as "sufficient" another, described as "somewhat weak." *Id.* at 1264 (cleaned up). The unrefuted interpretation of the unaddressed reason—"not want[ing] to leave [the juror] individually"—was that "the State did not want to leave a sole black juror whom they did not know on the jury panel." *Id.* The Eleventh

---

[1] Although *McGahee* does not mention the petitioner's race, the capital trial predated *Powers*. The petitioner's race had to overlap with the Black veniremembers who were struck from the jury.

Circuit explained that "a statement by the prosecutor that a juror was struck because of his race is a 'relevant circumstance'" in reviewing a *Batson* claim. *Id.*

The second omission was that, through cause and peremptory challenges, "100% of the African-American potential jurors were removed from the jury by the State." *Id.* at 1265. The *McGahee* court concluded that the failure of the Court of Criminal Appeals to discuss this was unreasonable given *Batson*'s identification of strike patterns as relevant to the discriminatory inquiry. *Id.*

The third "highly relevant" omission was the State's "explanation that it removed multiple African-American jurors because of their 'low intelligence' when the intelligence of the jurors was unsupported by any evidence in the record." *Id.* The *McGahee* court explained that this reason for striking a Black member of the venire was "particularly suspicious . . . given the role that the claim of 'low intelligence' has played in the history of racial discrimination from juries." *Id.*

These omissions are unlike Mr. Sharp's *Batson* circumstances. Mr. Sharp has not identified any explicitly racial explanations for striking a juror that the Alabama Court of Criminal Appeals unreasonably omitted from its *Batson* analysis. Additionally, Mr. Sharp does not contend that the Court of Criminal Appeals failed to consider relevant strike patterns or the removal of jurors for the racially suspect

39

and unsupported explanation of alleged "low intelligence." *McGahee*, 560 F.3d at 1265.

And the Court of Criminal Appeals considered, rather than omitted, the State's "'lack-of-sophistication' reason" for some strikes in reviewing Mr. Sharp's *Batson* claim. *Sharp Direct V*, 151 So. 3d at 364 n.6. The appellate court concluded that "[b]ased on the other race-neutral reason or reasons the prosecutor offered" for removing those potential jurors, "the trial court [did not] clearly err[] in denying *Batson* relief." *Sharp Direct V*, 151 So. 3d at 364 n.6.

Mr. Sharp cites other authorities to establish an unreasonable application of *Batson*, but none satisfy his exacting burden. Doc. 14 at 14 n.58. For example, several are non-binding on this court—*Sharp Direct V*, 151 So. 3d at 377 (Kellum, J. dissenting), and *Hall v. Thomas*, 977 F. Supp. 2d 1129 (S.D. Ala. 2013). Others, like *McGahee*, are too different from Mr. Sharp's case to be instructive. *See Lee v. Comm'r, Ala. Dep't of Corr.*, 726 F.3d 1172, 1228 (11th Cir. 2013) (distinguishing the outcomes on habeas *Batson* claims in which AEDPA deference did not apply based on "materially and starkly different" evidentiary records). Like *Lee*, *Adkins* is within that "starkly different" category. In *Adkins*, AEDPA deference did not preclude habeas relief because the Alabama Court of Criminal Appeals failed to "mention all the relevant circumstances" of discriminatory intent briefed on appeal.

40

710 F.3d at 1252. Instead, the appellate court "limited" the third-step discussion "to two sentences" about Alabama's clearly erroneous standard without providing any evidentiary context. *Id.* Given this bare-boned approach, the Eleventh Circuit could not "say that [the Alabama Court of Criminal Appeals] undertook 'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available,'" as *Batson* requires. *Adkins*, 710 F.3d at 1252 (quoting *Batson*, 476 U.S. at 93)).

The missing relevant circumstances included that (1) "the prosecut[or] explicitly noted the race of every black veniremember (and only black veniremembers) on the jury list . . . relied on in . . . selection." *Id.* And (2) the prosecutor expressed (at the *Batson* hearing, which occurred pre-*Powers*) that he "was not concerned with the *Batson* matter during voir dire because it was a white-on-white crime." 710 F.3d at 1256 (cleaned up). As the Eleventh Circuit explained, the prosecutor's statement "[wa]s an explicit acknowledgment" that *Batson* did not "constrain[] . . . [him] in exercising his peremptory challenge against black jurors." *Id.* Further, (3) the prosecutor swore an ex parte affidavit about his "mistaken belief" that one of the stricken Black jurors "was single." *Id.* at 1253. The trial court relied on the affidavit in denying *Batson* relief and "without giving [the petitioner] an adequate notice or opportunity to be heard." *Id.* 1253–54. As the Eleventh Circuit explained, the "affidavit [wa]s relevant because it was offered only after the trial

41

court brought contradictions in the record to the prosecutor's attention." *Id.* at 1254. The *Adkins* court concluded that the affidavit's contents were "difficult to credit" and "reek[ed] of afterthought." *Id.* (quoting *Miller–El v. Dretke*, 545 U.S. 231, 246 (2005)). Because the *Batson* record in *Adkins* is strikingly different from Mr. Sharp's claim, *Adkins* does not support his contention that the Criminal Court of Appeals reviewed his *Batson* claim unreasonably.

*Lee* is even less helpful to Mr. Sharp. The *Lee* court "conclude[d] that the state appellate court did not unreasonably apply *Batson* to . . . all [the] relevant circumstances." 726 F.3d at 1228. The Eleventh Circuit explained that "explicit racial statements and strong evidence of discriminatory purpose" were the key ingredients to the contrasting unreasonable application outcomes in *McGahee* and *Adkins*. *Lee*, 726 F.3d at 1213. Mr. Sharp lacks the "abundant racial discrimination evidence" that the *Lee* court explained "drove" the (d)(1) results in those cases. *Id.* at 1214.

Additionally, the *Lee* court rejected any notion that *McGahee* and *Adkins* "h[eld] that AEDPA deference does not apply to state court decisions accompanied by opinions that do not discuss all the evidence, circumstances, or arguments." *Id.* The *Lee* court explained: "The statements in *Adkins* about 'never mentioned' or 'did not mention' or about the lack of content in the state court opinion do not, and

42

cannot, establish a new rule for state court opinion-writing in our Circuit . . . ." *Id.* at 1223. *Lee* thus undercuts Mr. Sharp's contention that because the Alabama Court of Criminal Appeals did not address every issue of pretext, *de novo* review of his *Batson* claim is appropriate.

Mr. Sharp also cites two Supreme Court authorities: *Batson* and *Snyder v. Louisiana*, 552 U.S. 472 (2008). Doc. 14 at 13 ¶ 53. AEDPA deference was not an issue in either case. Regardless, neither decision demonstrates beyond debate that the Alabama Court of Criminal Appeals unreasonably rejected Mr. Sharp's *Batson* claim.

In *Batson*, the Supreme Court remanded the case "[b]ecause the trial court flatly rejected the [strike] objection without requiring the prosecutor to give an explanation for his action." 476 U.S. at 100. *Batson* thus did not comment on the application of step three. Likewise, *Batson* itself does not clearly establish that the reliance of the Court of Criminal Appeals on *Martin*'s "one-neutral-reason" rule was well-understood as an unacceptable misapplication of Supreme Court precedent. *See id.* at 99 n.24 ("[W]e make no attempt to instruct [state and federal] courts how best to implement our holding today.").

*Snyder* is instructive about *Batson* step three. In *Snyder*, "5 of the 36 [potential jurors] were black," and the prosecutor used peremptory strikes to remove "all 5."

552 U.S. at 476. As a result, the Black petitioner "was tried by an all-white jury." *State v. Snyder*, 942 So. 2d 484, 486 (La. 2006), *rev'd on other grounds*, 552 U.S. at 486. The petitioner in *Snyder* focused on two stricken jurors to support his *Batson* claim—Jeffrey Brooks and Elaine Scott. 552 U.S. at 477. The Supreme Court concluded that "the trial court committed clear error in . . . ruling on a *Batson* objection." *Id.* at 474. Additionally, because "the explanation given for the strike of Mr. Brooks [wa]s by itself unconvincing," there was no need "to consider the strike of Ms. Scott." *Id.* at 478.

One reason the prosecutor offered to support striking Mr. Brooks was that he "looked very nervous . . . throughout the questioning." *Id.* (cleaned up). The second was tied to Mr. Brooks's role as "a student teacher" and his concern about "miss[ing] class" because of jury service. *Id.* (cleaned up). According to the prosecutor, this employment created a risk that Mr. Brooks "might, to go home quickly, come back with guilty of a lesser verdict so there wouldn't be a penalty phase." *Id.* (cleaned up). The *Snyder* Court determined that the first reason lacked support in the record, and the second one was pretextual and incredible. *Id.* at 479, 485.

On the nervousness explanation, the gap in the record was that "the trial judge simply allowed the challenge without explanation" and made no "specific finding . . . concerning Mr. Brooks'[s] demeanor." *Id.* at 479. The Supreme Court elaborated

44

that the silence could have meant that the judge lacked a recollection of Mr. Brooks's demeanor or "found it unnecessary to consider [that first reason], instead basing his ruling completely on the second proffered justification for the strike." *Id.* Thus the *Snyder* Court could not "presume that the trial judge credited the prosecutor's assertion that Mr. Brooks was nervous" and considered the second reason. *Id.*

As for the "student-teaching obligation," "Mr. Brooks was 1 of more than 50 members of the venire who expressed concern that jury service or sequestration would interfere with work, school, family, or other obligations." *Id.* at 479–80. After learning—through court staff—that being away from work for one week of service was not "a problem" for the dean of the university and a "work[able]" situation, "Mr. Brooks did not express any further concern about serving on the jury." *Id.* at 481. Nor did the "prosecut[or] . . . choose to question [Mr. Brooks] more deeply about this matter." *Id.* The prosecutor struck Mr. Brooks peremptorily the day after the discussion about his potential student-teaching conflict, and the penalty phase concluded "by the end of the week." *Id.* The Supreme Court concluded that the prosecutor's "claimed . . . apprehensi[on]" that Mr. Brooks might have had a motivation to cut short the capital proceedings was "highly speculative." *Id.* at 482. The *Snyder* Court determined that the prosecutor's second explanation was dubious because he "anticipated on the record during *voir dire*" that the petitioner's trial

45

would be short. *Id.* at 482. The Court discussed also comparative racial analysis—how "the prosecutor's acceptance of white jurors who disclosed conflicting obligations that appear[ed] to have been at least as serious as Mr. Brooks['s]" demonstrated the implausibility of the student-teacher reason. *Id.* at 483. The Court thus concluded that "a discriminatory intent was a substantial or motivating factor" in the prosecutor's strike of Mr. Brooks and ruled that the collective circumstances did not warrant a remand on the "subtle question" of the prosecutor's discriminatory intent as a "determinative" factor, "more than a decade after petitioner's trial." *Id.* at 485–86.

*Snyder* illustrates how a facially-neutral explanation for a strike may lack support in the record. But *Snyder* does not clearly establish that applying the *Martin* rule to Mr. Sharp's *Batson* claim—under all the relevant circumstances—was unreasonable. The Supreme Court considered both explanations for striking Mr. Brooks in *Snyder* because the uncertain record on the nervousness reason required that exhaustive review. In Mr. Sharp's case, the Court of Criminal Appeals accepted that pretext existed but determined that each contested strike had at least one non-pretextual explanation that was race-neutral.

Finally, *Davis v. Ayala*, 576 U.S. 257 (2015), suggests that the one-neutral-reason rule is not an unreasonable application of *Batson*. The prosecutor in *Davis*

offered two race-neutral reasons to support a strike. *Id.* at 274–75. On the first justification, the Court explained that "the California Supreme Court appears to have interpreted the prosecutor's explanation of this strike to mean that Olanders D.'s views on the death penalty were alone sufficient to convince him to exercise a strike." *Id.* The Court continued that "this was certainly an interpretation of the record that must be sustained under 28 U.S.C. § 2254(d)(2)." *Davis*, 576 U.S. at 275. Because of the valid first justification, the Court found that "consider[ing] the prosecutor's supplementary reason for this strike—the poor quality of Olanders D.'s responses—" was "[un]necessary." *Id.* Still, the Court considered the sufficiency of the second explanation. *Id.*

Mr. Sharp has not established an unreasonable application of Supreme Court precedent in the rejection of his *Batson* claim based on the one-neutral-reason rule in *Martin*, or otherwise.

*Section 2254(d)(2) Analysis*

The court next evaluates Mr. Sharp's third-step credibility challenge under (d)(2). On habeas review, Mr. Sharp's factual challenges trigger two burdens. One, "a federal habeas court can only grant [relief] if it was unreasonable to credit the prosecutor's race-neutral explanations for the *Batson* challenge." *Rice*, 546 U.S. at

338. For Mr. Sharp, this means proving that the state court based the decision of no purposeful discrimination on objectively wrong facts. *See* 28 U.S.C. § 2254(d)(2).

Two, "[s]tate-court factual findings . . . are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'" *Rice*, 546 U.S. at 338–39 (quoting 28 U.S.C. § 2254(e)(1)). To overcome the presumptively correct *Batson* findings, Mr. Sharp must present clear and convincing evidence that his competing facts "are 'highly probable.'" *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984). To be clear, the presence of "a clearly erroneous factual determination . . . doesn't necessarily mean the state court's 'decision' was 'based on' an 'unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1035 (11th Cir. 2022) (quoting 28 U.S.C. § 2254(d)(2)). The critical deferential measure is how "important[t] . . . the factual error [was] to the state court's ultimate 'decision.'" *Id.* (cleaned up). Consequently, a "decision might still be reasonable 'even if some of the state court's individual factual findings were erroneous—so long as the decision, taken as a whole, doesn't constitute an 'unreasonable determination of the facts' and isn't 'based on' any such determination." *Id.* (cleaned up); *see Cockrell*, 537 U.S. at 341 (referring to subsections (e)(1) and (d)(2) as "independent requirements").

In the light of the pretext assessment by the Alabama Court of Criminal Appeals in *Sharp Direct V* discussed in the (d)(1) section above, the court assumes *arguendo* that the total circumstances for each challenged strike contain explanations that the record undermines and that may suggest a discriminatory animus on the part of the prosecutor. *See, e.g.*, *Sharp Direct V*, 151 So. 3d at 365 & n.8. But that is only one aspect of the *Batson* factual analysis: Mr. Sharp must establish that the Alabama courts assessed *Batson*'s third step unreasonably under all the relevant circumstances. The court thus turns to that analysis.

In addition to (1) the pattern of eliminating eleven of fourteen Black veniremembers and (2) evidence of pretext in explaining those strikes, Mr. Sharp relies on (3) historical information to support his *Batson* challenge. Doc. 14 at 28–30 ¶¶ 116-18. The historical evidence identifies four cases of racial discrimination in jury selection by the Madison County District Attorney's office, including one involving the prosecutor in Mr. Sharp's capital trial. *Id.* Although the Alabama Court of Criminal Appeals did not discuss this historical evidence in *Sharp Direct V*, it concluded broadly: "[T]he totality of the relevant facts supports the trial court's determination that the prosecutor's challenges were not based on race or ethnicity." *Sharp Direct V*, 151 So. 3d at 371.

49

Warden Raybon notes that four cases Mr. Sharp cites "took place more than a decade before his trial." Doc. 22 at 61. The *Batson* violation attributable to the same prosecutor occurred "more than 13 years before . . . trial." *Id.* Warden Raybon argues that the evidence is thus too "attenuated" to show a discriminatory purpose in Mr. Sharp's case. *Id.* (cleaned up).

Under two applicable precedents, Mr. Sharp's historical evidence is of little weight because of the remoteness in time between those trials and his. In *King v. Warden, Georgia Diagnostic Prison*, 69 F.4th 856, 864, 868–69 (11th Cir. 2023), the Eleventh Circuit rejected a *Batson* claim on AEDPA review even though—in the same trial—a different struck juror was reseated because of a successful discriminatory challenge and the prosecutor criticized the precedent twice during the selection process. Despite the relevancy of the prosecutor's *Batson* violation to the deferential evaluation of other challenged strikes, the *King* court was "hesita[nt] to second-guess [the trial court's] distinction among the strikes." 69 F.4th at 870–71.

Similarly, in *Madison v. Commissioner, Alabama Department of Corrections*, 761 F.3d 1240, 1252–53 (11th Cir. 2014), the Eleventh Circuit noted that over the eight years with *Batson* in place, the Mobile County District Attorney's Office had been the subject of seven violations in the Alabama appellate courts. *See also* Doc. 22 at 61–62. Additionally, the Eleventh Circuit had determined that the Mobile

County District Attorney's Office "had engaged in the 'systemic exclusion' of blacks from jury service." *Madison*, 761 F.3d at 1253 (cleaned up).

Another consideration relevant to Mr. Sharp's *Batson* claim, which he does not address, is the "subject matter" of his capital case. *United States v. Stewart*, 65 F.3d 918, 925 (11th Cir. 1995). Unlike the "trial of a black defendant for the murder of a white woman" in *King*, 69 F.4th at 869, or the white "defendants . . . being prosecuted for a racially motivated hate crime against black[] [residents]" in *Stewart*, 65 F.3d at 921, 925, the underlying facts of Mr. Sharp's criminal conduct do not involve a racial or interracial issue—both the victim and defendant are white. As the Eleventh Circuit described another *Batson* record without an obvious connection to race, "the subject matter of the case is not the least bit racial." *United States v. Hill*, 643 F.3d 807, 840 (11th Cir. 2011). That same observation applies here.

Further, the record contains no evidence of any inherently discriminatory questions or remarks during voir dire, nor any evidence of a racial motivation in jury selection. This precludes Mr. Sharp from establishing a discriminatory animus because nothing evinces obvious bias by the prosecutor against Black jurors. And it is fundamentally unlike the evidence of racial animus in *Adkins*. Mr. Sharp has identified no controlling precedent that supports *Batson* relief when a petitioner lacks any evidence of explicit racial animus.

Additionally, the implications of the strike pattern in Mr. Sharp's case are not as strong as in other *Batson* cases. Here, the prosecutor used less than forty percent of the peremptory strikes to remove eleven, but not all, of the Black members of the venire. *See United States v. Allison*, 908 F.2d 1531, 1537 (11th Cir. 1990) ("[T]he unchallenged presence of three blacks on the jury undercuts any inference of impermissible discrimination that might arise simply by the striking of other blacks."). Although the presence of one or more Black jurors "does not necessarily bar a finding of racial discrimination, . . . it is a significant fact." *Id.*

Indeed, had the two Black prospective jurors whom Mr. Sharp struck sat on the jury instead of white jurors, the racial composition of the jury (minus the alternates) would have had a higher percentage of Black individuals than the qualified pool—twenty-five percent Black and seventy-five percent white versus 19.72 percent Black and 80.28 percent white. Even the actual percentages of the final jury composition—8.3 percent Black and 91.7 percent white—are not vastly lower than the figures from the qualified pool. *See* Doc. 22 at 60.

Against this background, the court turns to the challenged strikes. Mr. Sharp maintains that the prosecutor's reasons for striking eleven Black jurors were pretextual and that "at least one juror was (and likely eight jurors were) struck in

violation of *Batson*." Doc. 14 at 102 ¶ 402; Doc. 27 at 17. The court begins with those eight potential jurors—Nos. 64, 74, 38, 47, 39, 52, 11, and 27.

For each of these eight, Mr. Sharp contends that all the prosecutor's reasons were pretextual. This court focuses on those explanations that the Alabama Court of Criminal Appeals determined were valid.

*1. Juror No. 64*

The trial court found that the prosecutor offered four reasons for striking Juror No. 64 and determined that they were all "race-neutral." Doc. 19-43 at 110 ¶¶ 1–4. One of those explanations was that Juror No. 64 had "served on three juries in six years and in at least one of those cases, the jury reached a 'not guilty' verdict." *Id.* ¶ 1. The others were that Juror No. 64 "appeared arrogant and vocal, giving the appearance of being a 'professional juror'"; "was a nurse, the same profession as the victim . . . and a key witness"; and "made a questionable notation" in answering the questionnaire. *Id.* ¶¶ 2–4.

The Alabama Court of Criminal Appeals concluded that no "clear error" had occurred "in the trial court's rejection" of this *Batson* challenge. *Sharp Direct V*, 151 So. 3d at 371. The appellate court did not address every reason offered to support the strike. *See id.* That court affirmed the finding of no "purposeful discrimination

because, among other things," her prior jury service "had resulted in an unfavorable verdict." *Id.*

Mr. Sharp asserts that the Court of Criminal Appeals unreasonably applied *Batson* because the trial court did not complete the third-step analysis of the demeanor reason. Doc. 14 at 22 ¶ 85 & n.83. Although the *Batson* order could have said more about Juror No. 64, the conclusion was clear: The trial court found that "the State demonstrated valid, race-neutral reasons for the use of its peremptory challenges." Doc. 19-43 at 112. The court continued that "[t]hose reasons which . . . [were] valid were not a function of pretext or sham" and that "no . . . relief [wa]s due . . . to [Mr. Sharp]." Doc. 19-43 at 112. Thus, the court rejects Mr. Sharp's (d)(1) contention tied to the *Batson* challenge to the strike of Juror No. 64.

Mr. Sharp next asserts that the prosecutor could not have relied plausibly on that trial outcome because the dental malpractice case on which Juror 64 served must have been a civil lawsuit. Doc. 14 at 23 ¶ 90; *id.* at 32 ¶ 125 & n.122. Mr. Sharp offers no evidence to support this point. Juror No. 64 reported on her questionnaire that she was on a jury that reached a not-guilty verdict in a dental malpractice case. Doc. 19-37 at 186. Likewise, Juror No. 64 did not mark with a check that her jury service included "a civil case." *Id.* Additionally, Mr. Sharp offers no response to Warden Raybon's points that even if the dental malpractice case was a civil matter,

the jury still reached "an unfavorable verdict" and "the State had even greater justification to strike Juror 64." Doc. 22 at 54. Specifically, Juror 64 "was part of a jury that found an alleged wrongdoer not liable, even though the burden of proof was less than beyond a reasonable doubt." *Id.*

According to Mr. Sharp, even if Juror 64 was on a jury that reached a not-guilty verdict in a dental malpractice case, that justification for the strike lacks credibility when compared with the strike of another Black person—Juror No. 74. *See* Doc. 27 at 9–11 (Juror No. 74 previously served as a juror in a capital trial in which the defendant's punishment was not death. *Id.* at 9). Mr. Sharp's comparison is unconvincing because the prosecutor treated the Black prospective jurors similarly—he removed Jurors 64 and 74 because both had participated on juries who returned less-than-favorable verdicts for the State. Importantly, Mr. Sharp identifies no examples of white jurors who served on his jury despite prior service on cases that ended with either a not-guilty verdict or a non-capital sentence.

Thus Mr. Sharp has not rebutted with clear and convincing evidence the correctness of the trial court finding on which the Alabama Court of Criminal Appeals relied in analyzing the strike of Juror No. 64. Accordingly, Mr. Sharp has not established that the Court of Criminal Appeals rejected Mr. Sharp's claim of purposeful discrimination based on unreasonable factual determinations and given

all the relevant circumstances. And Mr. Sharp has not demonstrated that objectively wrong facts were the bases for the decision of the Court of Criminal Appeals that race-neutral reasons were determinative of the *Batson* issue.

*2. Juror No. 74*

The trial court found that the prosecutor offered four reasons for removing Juror No. 74 from the venire. Doc. 19-43 at 111 ¶¶ 1–4. One of the proffered explanations pertained to Juror No. 74's prior service on a capital murder case. *Id.* ¶ 1. In that trial, "the [d]efendant received a life sentence." *Id.* The other justifications for deselecting Juror No. 74 were that her son had twice been a robbery victim; she was a secretary; and she gave a questionable response on the juror questionnaire. *Id.* ¶¶ 2-4.

The trial court found that Juror No. 74's participation "on a prior jury which returned a verdict which was less than favorable to the prosecution [wa]s a race-neutral reason." *Id.* at 111–12. Additionally, the trial court credited as a valid justification the "two violent crimes" that her son had experienced. *Id.* at 112.

The court did not accept as "clearly a race-neutral reason" Juror No. 74's employment as a secretary and did not analyze the reason tied to a questionnaire response. *Id.* Still, "based upon the other articulated reasons," the court concluded that the prosecutor did not strike Juror No. 74 "for any improper reason." *Id.* The

Alabama Court of Criminal Appeals affirmed the *Batson* ruling and referenced only the grounds of Juror No. 74's prior jury service in a capital case and her son as "a victim of a crime." *Sharp Direct V*, 151 So. 3d at 366.

Mr. Sharp maintains that Juror 74's prior service on a capital case in which the defendant did not receive the death penalty "was hardly 'unfavorable'" to the State. Doc. 27 at 14. But Mr. Sharp's opinion is not clear and convincing evidence.

Alternatively, Mr. Sharp points out that the prosecutor "did not know how Juror No. 74 voted in that case" and could have questioned her about that during voir dire. *Id.* But "[n]either a prosecutor's mistaken belief about a juror nor failure to ask a voir dire question provides 'clear and convincing' evidence of pretext." *Parker v. Allen*, 565 F.3d 1258, 1271 (11th Cir. 2009).

Mr. Sharp mentions additionally that the context of the *Batson* hearing transcript shows that the prosecutor's focus "was primarily (if not wholly) on the fact of [Juror No. 74's] service" without regard to the sentence and not wanting an "expert juror[] or seasoned juror[] in th[e] case." Doc. 27 at 14 & n.37 (cleaned up). But this is not "clear and convincing evidence" and is inadequate to overcome AEDPA deference.

Regarding the reason about Juror No. 74's son, Mr. Sharp argues that comparative juror analysis shows that reason was pretextual. Doc. 14 at 83 ¶¶ 322–

27. Warden Raybon acknowledges that "[Mr.] Sharp identifies other jurors who were victims or had friends or family who were the victims of violent crimes." Doc. 22 at 112. Warden Raybon argues that Juror No. 74 is not similarly situated to those white jurors who served because of her prior service on the murder case that ended in a life sentence for the defendant. *Id.* According to Warden Raybon, Juror No. 74's prior jury experience on a capital case is a relevant distinction between her and the white jurors, which counteracts Mr. Sharp's comparative analysis to support pretext. *See id.* at 106, 112. Specifically, a "prosecutor's failure to strike similarly situated jurors is not pretextual . . . 'where there are relevant differences between the struck jurors and the comparator jurors.'" *Parker*, 565 F.3d at 1271 (cleaned up). This similarly situated argument establishes why the unfavorable verdict explanation is not pretextual.

In discussing the reason, the Court of Criminal Appeals stated: "In addition, the fact that Juror no. 74's son had been a victim of a crime was . . . a valid basis for exercising a peremptory challenge to remove [her]." *Sharp Direct V*, 151 So. 3d at 366. Because the Court of Criminal Appeals did not base its *Batson* decision on an unreasonable factual determination in crediting the unfavorable verdict reason, Mr. Sharp has not satisfied his (d)(2) burden on this strike. Despite the crime reason (which the record does not validate when comparing other white jurors), the

unfavorable verdict reason supports the *Batson* denial independently under all the relevant circumstances. *See Pye*, 50 F.4th at 1035. Consequently, Mr. Sharp has not overcome AEDPA deference under (d)(2) based on stricken Juror No. 74.

Alternatively, to the extent that the Court of Criminal Appeals applied to this strike a dual motivation analysis akin to *Wallace*, Mr. Sharp has not proven a right to habeas relief. Specifically, Mr. Sharp has not demonstrated that objectively-wrong facts were the bases for the Court of Criminal Appeals' decision that the race-neutral reason of an unfavorable verdict was determinative of the *Batson* issue.

*3. Juror No. 38*

The trial court found that the prosecutor offered four reasons for striking Juror No. 38. Doc. 19-43 at 110 ¶¶ 1–4. One of those explanations was that she showed "inattentiveness" during the selection process. *Id.* ¶ 4. The other three were Juror No. 38's "employment history;" "lack of sophistication;" and "lack [o]f responses." *Id.* ¶¶ 1–3.

The court observed Juror No. 38's "demeanor and participation" during voir dire and credited the race-neutral reason of her inattentiveness as "justified." *Id.* at 110. The court accepted Juror No. 38's "fail[ure] to complete [the] . . . questionnaire" as a race-neutral explanation. *Id.* The court found that "misspell[ing] a word" in completing the questionnaire "d[id] not necessarily [reflect] a lack of

59

sophistication." *Id.* at 111. The court continued that "when coupled with her employment history and . . . demeanor, . . . the use of [the] peremptory strike . . . was race-neutral." *Id.*

The Alabama Court of Criminal Appeals recognized that "[t]he trial court . . . was in the best position to judge the demeanor of the veniremembers . . . ." *Sharp Direct V*, 151 So. 3d at 365. The appellate court concluded that "the trial court did not clearly err in its [*Batson*] determination" because "it had observed [her] demeanor" and found that "[she] was inattentive during the voir dire process." *Id.* at 365–66.

Mr. Sharp contests the appellate court's ruling as "inconsistent and implausible." Doc. 14 at 19–20 ¶ 76. Mr. Sharp acknowledges that the prosecutor noted contemporaneously that Juror No. 38 "appeared to [him] to be somewhat inattentive and disinterested during the voir dire process." *Id.* at 17 ¶ 66 (emphasis omitted). Mr. Sharp attempts to discredit that notation by summarizing Juror No. 38's participation from the voir dire transcript and comparing that to the record of others who served on jury. *Id.* at 18 ¶¶ 69–70; *id.* at 51 ¶¶ 206–07. But responding to questions as often as other veniremembers does not clearly and convincingly refute the contemporaneous observations that Juror No. 38 appeared to show inattentiveness to or disinterest in the selection process.

60

Additionally, Mr. Sharp points to the absence of any concern raised about Juror No. 38's inattentiveness generally or on the trial court's strike sheet. *Id.* at 18 ¶¶ 71–72. But the absence of such specific evidence cannot overcome the presumptively correct factual findings on Juror No. 38.

Mr. Sharp questions "the trial court's purported memory of Juror No. 38's inattentiveness nearly four years after jury selection." *Id.* at 19–20 ¶ 76. But the only authority Mr. Sharp cites for this point does not support his position. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985) (observing that credibility determinations "demand[] even greater deference to the trial court's findings[,] for only the trial judge can be aware of the variations in demeanor and tone of voice"). Likewise, Mr. Sharp offers nothing to counter Warden Raybon's reliance on the Supreme Court's discussion of the peremptory process in *Davis*. *Compare* Doc. 22 at 75–76, *with* Doc. 27 at 11.

In *Davis*, the Supreme Court summarized the doctrine of demeanor deference and observed:

> We have previously recognized that peremptory challenges "are often the subjects of instinct," . . . and that "race-neutral reasons for peremptory challenges often invoke a juror's demeanor" . . . . A trial court is best situated to evaluate both the words and the demeanor of jurors who are peremptorily challenged, as well as the credibility of the prosecutor who exercised those strikes.

61

> As we have said, "these determinations of credibility and
> demeanor lie peculiarly within a trial judge's province,"
> and "in the absence of exceptional circumstances, we will
> defer to the trial court." . . . "Appellate judges cannot on
> the basis of a cold record easily second-guess a trial
> judge's decision about likely motivation."

576 U.S. at 273–74 (cleaned up). The Court continued that "even if reasonable minds

reviewing the record might disagree about the prosecutor's credibility, on habeas

review that does not suffice to supersede the trial court's credibility determination."

*Id.* at 274 (cleaned up). Mr. Sharp's interpretative arguments about the record

conflict with the guidance in *Davis* and are insufficient under AEDPA.

*4. Juror No. 47*

The trial court found that the prosecutor offered four reasons for striking Juror

No. 47 from the venire. Doc. 19-43 at 111 ¶¶ 1–4. One of those justifications was

the "prospective juror's display of hostility." *Id.* ¶ 3. The others were Juror No. 47's

"lack of sophistication," "veracity," and "criminal history for issuing worthless

checks." *Id.* ¶¶ 1–2, 4.

In the light of the "opportunity to observe this juror and her demeanor," the

trial court credited the explanation of hostility based on the prosecutor's

"perception" as "a valid, race-neutral reason." *Id.* at 111. The court found that Juror

No. 47's "criminal conviction also justified the State's use of a peremptory [strike]."

*Id.* The court acknowledged that "[a] perceived lack of sophistication" when a case has "technical expert evidence" can "constitute a race-neutral reason for the use of a peremptory challenge." *Id.*

The Alabama Court of Criminal Appeals affirmed because of Juror No. 47's perceived hostility. *Sharp Direct V*, 151 So. 3d at 365–66. The appellate court did not analyze the other referenced reasons. *Id.*

During the *Batson* hearing, the prosecutor explained that he "detected a hostility on [Juror No. 47's] part" which, in his mind, created an uncertainty about her "want[ing] to be [t]here"—called to court for jury duty. Doc. 19-43 at 132. Mr. Sharp asserts that the prosecutor's explanation of hostility "is nothing more than *post hoc* justification." Doc. 27 at 15. Mr. Sharp points out that the prosecutor focused more on Juror No. 47's "purported unsophistication" than her hostility. Doc. 27 at 16; Doc. 19-43 at 131–33. According to Mr. Sharp, this means that hostility could not be the real reason for striking Juror No. 47; instead, the pretextual explanation of a "somewhat suspect" "sophistication level" must have been the prosecutor's true motivation. Doc. 19-43 at 132.

Mr. Sharp fails to address the deference that has attached to the prosecutor's race-neutral reason of Juror No. 47's hostility, which the trial court credited and the Alabama Court of Criminal Appeals affirmed. *Sharp Direct V*, 151 So. 3d at 365–

66. Thus, as with this court's analysis of Juror No. 38, Mr. Sharp has satisfied neither (e)(1) nor (d)(2) in challenging the prosecutor's strike of Juror No. 47.

*5. Juror No. 39*

The trial court found that the prosecutor offered five reasons for striking Juror No. 39. Doc. 19-43 at 107 ¶¶ 1–5. One of the justifications was Juror No. 39's standing religious conflict on Saturdays as a Seventh-day Adventist and the potential that the trial would last beyond Friday. *Id.* ¶ 1. The other explanations were Juror No. 39's "unemployed" status; "involve[ment] in prison ministries"; "incomplete" questionnaire; and questionable ability to "be fair." *Id.* ¶¶ 2–5.

During voir dire, Juror No. 39 shared "that he could not engage in any activities other than religious [ones] on Saturdays." *Id.* at 108. In the *Batson* hearing, the prosecutor emphasized that Juror No. 39's religious restriction was the "primary reason[]" for the strike. *Id.* at 123. The trial court found that "sufficient evidence existed to support the use of a peremptory challenge" because of Juror No. 39's religious practices. *Id.* at 108.

The court observed that Juror No. 39's unemployment, "standing alone," might "not constitute a sufficient reason" for the strike. *Id.* Still, the court determined that "no racially motivated animus [existed] in the use of th[e] peremptory challenge" because of "the validity of the other stated reasons." *Id.*

64

The Alabama Court of Criminal Appeals began its analysis with Mr. Sharp's argument that the prosecutor had not struck white jurors "who were similarly situated" to Juror No. 39. *Sharp Direct V*, 151 So. 3d at 370. As an example, the appellate court mentioned that the prosecutor removed Juror No. 39, "who was involved in prison ministries," even though Juror No. 79, who was white and studying to become a minister, remained on the jury. *Id.*

The appellate court next considered the issue of Juror No. 39's religious beliefs. *Id.* at 370 & n.13. As relevant background, the court discussed the prosecutor's reliance on a similar reason to strike Jurors No. 11 and 52. *Id.* n.13. Specifically, these three prospective jurors had reported "on their questionnaires that the religion they practiced[—Seventh-day Adventists for two and a Sabbath Keeper for one—]generally prohibited working on Saturdays." *Id.* The court continued that only Juror No. 39 expressed "during individual voir dire, that his religious beliefs (as a Seventh–[d]ay Adventist) would prohibit him from serving as a juror on Saturday." *Id.*

The court considered the prosecutor's decision not to strike Juror No. 29. *Id.* The appellate court explained that Juror No. 29's preference to prepare for Sunday's service in the afternoon on Saturday was not an absolute restriction but rather a conflict that he could "get around." *Id.* (cleaned up). Additionally, Juror No. 29

planned to attend a play with his wife on Saturday evening, so moving his communion preparations to Saturday night was not his "preference." Doc. 19-12 at 20–21. Ultimately, the appellate court determined that "Juror [N]o. 29 was not similarly situated to Jurors [N]o. 11, 39, and 52." *Sharp Direct V*, 151 So. 3d at 370 n.13. The appellate court relied on the trial court's observations of the veniremembers during voir dire to conclude that "[t]he materials before [it] d[id] not demonstrate that the trial court's determination was clearly erroneous." *Id.* at 370.

On habeas review, Mr. Sharp notes Warden Raybon's concession that "some of the reasons proffered by the State . . . were weak." Doc. 27 at 11. Warden Raybon refers to Juror No. 39's "employment status, . . . incomplete answer on his juror questionnaire, and ancillary religious-based concerns" as "not particularly strong reasons." Doc. 22 at 91. But this admission does not satisfy Mr. Sharp's factual burdens on AEDPA review.

Warden Raybon relies on the analysis in *Sharp Direct V*, recognizing that Juror No. 39's firm religious conflict with Saturdays meant that he and Juror No. 29 were not similarly situated. *Id.* at 84. Mr. Sharp does not rebut this distinction or establish that the Court of Criminal Appeals relied on clearly and convincingly wrong facts to uphold this strike. *See* Doc. 27 at 11–12.

66

Although both parties discuss Juror No. 59's status as a potential white comparator, Doc. 14 at 54 ¶ 219; Doc. 22 at 84, unexhausted procedural default bars consideration of that evidence on habeas review. The Court of Criminal Appeals did not address this juror comparison in *Sharp Direct V*, and Mr. Sharp did not address it in his *Batson* briefs on direct appeal. Doc. 19-49 at 28–32; Doc. 19-50 at 26–30. Consequently, AEDPA precludes consideration of this additional evidence to prove a racial animus in the strike of Juror No. 39. *See, e.g.*, *Kelley*, 377 F.3d at 1344 ("[T]he prohibition against raising nonexhausted claims in federal court extends not only to broad legal theories of relief, but also to the specific assertions of fact that might support relief.").

*6. Juror No. 52*

The trial court found that the prosecutor offered five reasons for removing Juror No. 52. Doc. 19-43 at 108 ¶¶ 1–5. The court credited as race-neutral explanations Juror No. 52's "brother [who] had a criminal history and was murdered" without any "prosecut[ion] for that crime" and her witnessing a murder. *Id.* at 108. The court accepted as a valid justification Juror No. 52's "religious affiliation" as a "Sabbath Keeper." *Id.* The court did not discuss the explanation based on Juror No. 52's "studying to become a minister." *Id.* ¶ 2. The court found that the record lacked support for the justification that Juror No. 52's "work history

67

was not conducive to serving" on the jury. *Id.* at 108. The court continued that "[n]onetheless, the totality of the reasons given supports the finding that the State did not improperly strike [her]." *Id.* at 108–09.

The Alabama Court of Criminal Appeals mentioned Mr. Sharp's argument that Juror No. 52 and Juror No. 79, who was white, "were both studying to become ministers." *Sharp Direct V*, 151 So. 3d at 370. The appellate court continued that "[a]lthough" the prosecutor had relied on the minister reason, that was not his only explanation. *Id.* The court accepted the justifications based on Juror No. 52's witness of a murder and the information about her brother which the prosecutor raised at the hearing. *See id.* Additionally, the Court of Criminal Appeals credited the explanation that Juror No. 52's practice as a Sabbath Keeper posed a religious conflict if the trial lasted until Saturday. *See id.* at 370 n.13. The appellate court saw no clear error in the trial court's denial of *Batson* relief. *Id.* at 370.

Although Warden Raybon mentions Juror No. 52's reported sexual assault as a race-neutral reason, Doc. 22 at 93, excluding that justification from the *Batson* analysis is appropriate because that information was not one of the prosecutor's explanations, Doc. 19-43 at 124–25. Additionally, Warden Raybon admits that Juror No. 52's employment history "was not a strong reason to exercise a peremptory strike." Doc. 22 at 96. But such a concession does not constitute clear or convincing

68

evidence of a factual error or satisfy Mr. Sharp's burden to demonstrate a (d)(2) error in the Alabama Court of Criminal Appeals' *Batson* decision.

Concerning Juror No. 52's religious practices on Saturdays and personal experiences with murder, Warden Raybon maintains that Mr. Sharp has not established that those explanations were pretextual through differing treatment of similarly situated white jurors or other undermining evidence. *Id.* at 92, 94. Warden Raybon makes the same arguments about the minister justification and the comparison to a white minister (Juror No. 79) who served on the jury. Doc. 22 at 96; Doc. 14 at 63 ¶ 253.

Mr. Sharp replies generally that the facial neutrality of the prosecutor's justifications "for any juror" does not make those strikes "less pretextual." Doc. 27 at 12. Focusing on the minister reason, Mr. Sharp contends that Warden Raybon "grasp[s] to explain" the prosecutor's differing treatment of Juror No. 52 and similarly situated Juror No. 79. *Id.* at 12–13. Mr. Sharp does not address the prosecutor's other explanations for striking Juror No. 52—the religious and exposure to murder justifications. *Id.*

For present purposes, consistent with the Court of Criminal Appeals' unwillingness to credit the minister explanation and the trial court's discounting of the work history reason, this court accepts that those justifications suggest some

pretext. Nevertheless, Mr. Sharp cannot obtain habeas relief on this challenged strike.

Under (e)(1), Mr. Sharp has not shown, clearly and convincingly, that this court should disregard the findings that he failed to establish pretext on the other race-neutral reasons that the Court of Criminal Appeals determined supported the strike of Juror No. 52. Additionally, Mr. Sharp has not demonstrated under (d)(2) that the Court of Criminal Appeals relied on unreasonable factual determinations in concluding that, despite some evidence of pretext, under all the relevant circumstances purposeful race discrimination was not the prosecutor's motivation. And Mr. Sharp has not established that objectively-wrong facts are the bases for the decision by the Alabama Court of Criminal Appeals that race-neutral reasons were determinative of the *Batson* issue.

*7. Juror No. 11*

The trial court found that the prosecutor provided four justifications for striking Juror No. 11. Doc. 19-43 at 109 ¶¶ 1–4. The court credited three as race-neutral explanations: Juror No. 11's "religious affiliation" as a Seventh-day Adventist; a previous worthless check conviction; and evasiveness because of an insufficient response on the questionnaire. *Id.* at 109. "[S]tanding alone," the court questioned whether Juror No. 11's "current unemployment . . . [was] a sufficiently

race-neutral reason." *Id.* at 109–10. But "when compil[ing]" the unemployment explanation "with the other factors enunciated," the court found that the prosecutor's "reasons stated were sufficient" to deny the *Batson* challenge. *Id.* at 110.

The Alabama Court of Criminal Appeals upheld this strike for several reasons. As mentioned above, the appellate court credited—as race-neutral and non-pretextual—the potential religious conflict that Juror No. 11 had with Saturdays as a Seventh-day Adventist. *Sharp Direct V*, 151 So. 3d at 370 n.13.

Also, the Court of Criminal Appeals accepted as valid the previous conviction reason stated by the prosecutor. *Id.* at 366. The court described Juror No. 11's worthless check conviction as "a crime of moral turpitude." *Id.* The court cited four decisions in which it had concluded that a veniremember's involvement with writing bad checks was a race-neutral reason to support a strike. *Id.* at 366–67.

To counter the analysis in the dissenting opinion about Juror No. 11's previous conviction, the majority in *Sharp Direct V* elaborated on several points. *Id.* at 366 n.9. The court framed the question for the trial court to resolve as not "[w]hether [Juror No. 11] actually had [a] prior conviction[]," but whether the prosecutor was "*credib[le]*" in relying on that reason. *Id.* Additionally, the court observed that the mere fact of the prosecutor's mistaken belief about the existence of a prior conviction

71

"would not necessarily mean that [Mr.] Sharp met his burden of proving purposeful discrimination." *Id.*

The court distinguished Mr. Sharp's claim from *Ex parte Thomas*, 601 So. 2d 56, 58 (Ala. 1992), in which "the State . . . had exclusive access to the evidence that [the petitioner] could have used to evaluate the credibility of the . . . stated reason for striking three of the potential jurors." *Sharp Direct V*, 151 So. 3d at 366 n.9.

Next, the Court of Criminal Appeals considered Mr. Sharp's contention that the prosecutor's strike of Juror No. 11 reflected disparate treatment. Mr. Sharp based this on the prosecutor's failure to remove Juror No. 24, who was "a [convicted] Caucasian." 151 So. 3d at 367. Juror No. 24 "stat[ed] on his questionnaire that he had previously been convicted of assault." *Id.*

The appellate court explained why the two jurors were not similarly situated. *Id.* at 367–68. Juror No. 11 did not disclose that she had a prior conviction or any involvement with Madison County law enforcement on the questionnaire, and reported "only that her brother had been convicted of a crime." *Id.* at 368. Juror No. 24 reported "on his juror questionnaire that he had . . . an assault conviction in 2000 in Memphis, Tennessee." *Id.* at 367–68. Additionally, Juror No. 24 disclosed that "his only involvement with law enforcement in Madison County was as a citizen— specifically, in his capacity as manager of a local department store." *Id.* at 368.

72

Referring to "the fundamental importance of truthful responses from prospective jurors," the court rejected Juror No. 24 as a suitable comparator for pretext purposes. *Id.*

The court considered and countered the dissenting judge's reasoning on pretext. *Id.* at 366 n.10. The dissenting judge concluded that the record did not support relying on the questionnaire as an explanation for the strike or to rebut pretext because the prosecutor did not mention that document or Juror No. 11's untruthfulness as a reason for striking her. *Id.* The court relied on the trial court's finding that Juror No. 11 had provided "insufficient responses to the questions asked." *Id.*

Likewise, the Court of Criminal Appeals did not accept the prosecutor's failure to ask Juror No. 11 questions about her conviction as evidence of pretext. *Id.* at 368. The court explained that a purpose of the questionnaire process was to streamline jury selection and that once the State became aware of the "discrepancy" in Juror No. 11's responses, "duplicat[ing]" questions about the conviction was unnecessary and potentially risky. *Id.* at 368–69. The court acknowledged that the prosecutor could have requested individualized voir dire to cover the conviction topic privately. *See id.* at 369 n.11. Still, the court concluded that the prosecutor's failure to use that option— "[u]nder the circumstances here"—did not "mean[] that

the trial court clearly erred in its determination that the State did not engage in purposeful discrimination with respect to its striking of Juror[] [N]o. . . . 11." *Id.*

Citing *Martin*, the court determined that its "holding" on the "prior undisclosed conviction[] provided a legitimate, race-neutral reason for the . . . strike" and eliminated any "need [to] address [Mr.] Sharp's arguments regarding the other reasons." *Id.* at 369 n.12.

Most of Mr. Sharp's habeas arguments repeat what he briefed on direct appeal. But Mr. Sharp attempts to add a new comparator to challenge the prosecutor's conviction explanation as a pretext. Juror No. 59 "failed to disclose" on the questionnaire that "he had been convicted of [a] misdemeanor . . . [for] failing to appear on a traffic citation in Madison County." Doc. 14 at 76 ¶ 295 (footnotes omitted); Doc. 14-2 at 5. According to Mr. Sharp, "[i]f failing to disclose a misdemeanor conviction was a reason to strike a juror, then Juror No. 59 should also have been struck by the State." Doc. 14 at 76 ¶ 296 (footnotes omitted).

For the same reasons discussed in analyzing the strike of Juror No. 39, *see supra* at 68, this argument is procedurally defaulted because it is unexhausted. Juror No. 59's undisclosed conviction is beyond the scope of AEDPA review and does not help Mr. Sharp prove that the prosecutor had a racial animus in striking Juror No. 11. *See Kelley*, 377 F.3d at 1344.

74

In reply to Warden Raybon's arguments regarding AEDPA deference, Mr. Sharp focuses on the religious explanation only. Doc. 27 at 13. Mr. Sharp points out that Juror No. 11, in contrast to Juror No. 39, did not speak up when the entire venire was questioned about serving on Saturday. *Id.* According to Mr. Sharp, the absence of any questions about Juror No. 11's actual availability renders the religious reason for striking her "patently pre[]textual." *Id.*

But the mere failure of the prosecutor to ask a question in voir dire is not clear and convincing evidence to overcome a pretext finding under (e)(1). *See Parker*, 565 F.3d at 1271. And Mr. Sharp offers nothing else to rebut the presumptively correct state court findings underlying this *Batson* ruling.

The Alabama Court of Criminal Appeals may have relied on an erroneous fact in its analysis of the conviction reason for the strike of Juror No. 11. Specifically, the Court of Criminal Appeals relied on the trial court's finding that Juror No. 11's "insufficient responses" to questions meant that she and Juror No. 24—who listed his conviction on the questionnaire—were not similarly situated for strike purposes. *Sharp Direct V*, 151 So. 3d at 366 n.10. But the transcript reflects that the trial court's finding about Juror No. 11's "insufficient responses" corresponded with the prosecutor's comments in the hearing about two questions which she did not address or answer "fully"—numbers 74 and 79 on the questionnaire. *Compare* Doc. 19-43

75

at 109 ¶ 3, *with id.* at 127–28. Neither one of these questions sought information about a potential juror's criminal history or interaction with law enforcement. Doc. 19-37 at 25–26. Those questions involved the guilt of the accused and media coverage. *Compare* Doc. 19-37 at 25–26, *with id.* at 19–20. Thus, the transcript calls into question the appellate court's reliance on the trial court's "insufficient responses" finding to conclude that Juror No. 24 was a valid comparator for Juror No. 11. *Sharp Direct V*, 151 So. 3d at 366 n.10.

Even so, AEDPA requires Mr. Sharp to prove clearly and convincingly that the fact of Juror No. 11's untruthfulness on the questionnaire, which the Court of Criminal Appeals relied on to distinguish her from Juror No. 24, was wrong. Mr. Sharp has not satisfied that standard. And even if he had satisfied that standard, Mr. Sharp has not established that the unreasonable determination was so essential to the *Batson* outcome that AEDPA deference should detach under (d)(2). *See Pye*, 50 F.4th at 1035. This is because the conviction explanation was not the only basis for upholding the strike. And Mr. Sharp has not shown that the factual determinations underlying the appellate court's reliance on the religious justification or affirming the overall finding of no purposeful discrimination were unreasonable.

*8. Juror No. 27*

The trial court found that the prosecutor offered three reasons for striking Juror No. 27: an "employment history [which] [demonstrated] a lack of sophistication"; a drug possession conviction; and the prosecutor's "belief" that he may have represented the State in her criminal case. Doc. 19-43 at 109 ¶¶ 1–3. The court determined that the lack of sophistication justification was race neutral based on its observations of Juror No. 27 and the responses she gave. *Id.* at 109.

The court determined that the drug conviction justification was race neutral based on Alabama Supreme Court authority. *Id.* And the court found that Juror No. 27 "never [stated] that she recognized [the prosecutor]" during jury selection even though he suspected that he may have prosecuted her. *Id.* The court determined that "[t]hese reasons supported [Juror No. 27's] removal as a juror." *Id.*

The Court of Criminal Appeals combined the *Batson* analysis of Juror No. 27 with Juror No. 11. *Sharp Direct V*, 151 So. 3d at 366. The appellate court noted Mr. Sharp's "particular exception" to the lack of sophistication explanation. *Id.* The prosecutor used this term explicitly to justify striking Juror No. 27 but not Juror No. 11. Doc. 19-43 at 126–27. Following *Martin*, the court did not examine the credibility of this reason and moved to the other two explanations offered in support of the strike. *Sharp Direct V*, 151 So. 3d at 366, 369 n.12.

The court concluded that Juror No. 27's "charge[s] in Madison County [of] six counts of possession of marijuana," including a conviction "on at least one of those counts" and the prosecutor's "likely" role in securing that conviction were "valid race-neutral reasons." *Id.* at 366. Additionally, the court referenced several cases in which comparable explanations for striking a prospective juror were sufficient under *Batson*. *Id.*

As with Juror No. 11, the court rejected Mr. Sharp's comparator argument based on Juror No. 24. *Id.* at 367–68. Specifically, the court observed that unlike Juror No. 24, who had disclosed his conviction on the questionnaire, "Juror [N]o. 27 simply answered 'no' to the question." *Id.* at 368. Additionally, Juror No. 27 did not report prior involvement with law enforcement as a criminal defendant. *Id.*

The majority responded to the dissenting judge's view that truthfulness on the questionnaire was not a reason the prosecutor used to support the strike. *Id.* at 368 n.10. The court referred to the trial court's finding that Juror No. 27 "never [disclosed] that she recognized [the prosecutor]." *Id.* (emphasis omitted).

Mr. Sharp challenges some factual findings as clearly erroneous based on the hearing transcript. Doc. 14 at 20–21 ¶¶ 78-82; *id.* at 94 n.337. Mr. Sharp argues also that because the lack of sophistication reason (tied to Juror No. 27's employment) was the prosecutor's "'first and foremost'" explanation for removing her and

pretextual—when compared to other white jurors—he has proven purposeful race discrimination. Doc. 19-43 at 126; Doc. 27 at 16–17.

The court begins with Mr. Sharp's factual challenges to the trial court findings. Mr. Sharp maintains that the prosecutor did not comment on Juror No. 27's "fail[ure] to recognize him" or confirm that "he was actually involved in the prosecution of [her criminal] case." Doc. 14 at 20 ¶ 80. In discussing Juror No. 27's drug charges and conviction, the prosecutor stated that the "cases arose back in 1990," and he "was exclusively a drug prosecutor from [19]88 until [19]94." Doc. 19-43 at 126. The prosecutor continued that "[he] would have been in the office" while those charges were pending against Juror No. 27. *Id.*

The trial court found that the district attorney "had a belief that he may have served as the prosecutor on her case" and that the prosecutor may have been involved with Juror No. 27's drug charges. *Id.* at 109 ¶ 3. These findings were not clearly erroneous. Likewise, the appellate court's determination that the prosecutor "likely prosecuted Juror [N]o. 27's case" was not clearly erroneous in the context of the *Batson* hearing. Doc. 14 at 21 ¶ 81 (emphasis omitted); *Sharp Direct V*, 151 So. 3d at 366, 369.

Further, even if the prosecutor actually had no direct personal involvement with Juror No. 27's criminal charges, that circumstance would not render the strike

invalid. *See, e.g.*, *Gamble v. State*, 791 So. 2d 409, 424–25 (Ala. Crim. App. 2000) (affirming denial of *Batson* motion when the prosecutor's office had pursued worthless check and marijuana charges against the prospective juror).

That said, the transcript of the *Batson* hearing confirms that the prosecutor did not say anything about Juror No. 27's failure to recognize him. Doc. 19-43 at 126–27. The Court of Criminal Appeals relied on that unsubstantiated fact in the comparative analysis of Juror No. 24 to stricken Juror No. 27. *Sharp Direct V*, 151 So. 3d at 368 n.10.

Because the appellate court relied on an erroneous fact to distinguish the white comparator example, Mr. Sharp has demonstrated pretext with respect to the conviction reason for striking Juror No. 27. Still, Mr. Sharp has not established that the unreasonable determination otherwise was so essential to the *Batson* outcome that AEDPA deference should detach under (d)(2). *See Pye*, 50 F.4th at 1035. This is because the conviction explanation was not the only basis for upholding the strike. And Mr. Sharp has not shown that the factual determinations underlying the appellate court's reliance on the reason of a "likely" drug prosecution of Juror No. 27 or affirming the overall finding of no purposeful discrimination were unreasonable.

*9. Jurors No. 37, 55, and 65*

In his petition, Mr. Sharp contends the prosecutor struck Jurors No. 37, 55, and 65 for pretextual reasons in addition to their "across the board . . . oppos[ition] to the death penalty." Doc. 14 at 98 ¶ 379 & n.346. The Alabama Court of Criminal Appeals denied *Batson* relief based on these stricken jurors. *Sharp Direct V*, 151 So. 3d at 365, 370–71. Warden Raybon answers that (d)(2) and (e)(1) preclude habeas relief on these strikes. Doc. 21 at 40–42 ¶¶ 100-06.

On habeas review, Mr. Sharp does not rely on these jurors to support independent *Batson* claims but rather as additional evidence of pretext. This includes Mr. Sharp's calculations of the combined reasons for strikes and an estimated percentage of invalid justifications based on his view of the record. *See* Doc. 14 at 102 ¶¶ 398–401. Because Mr. Sharp did not present this assertion to the Alabama Court of Criminal Appeals, it is procedurally defaulted as unexhausted and bars him from using these new or transformed habeas allegations to satisfy his (d)(2) burden. Additionally, because of the race-neutral reason that the Alabama Court of Criminal Appeals determined supported these strikes, Mr. Sharp's reliance on these examples as circumstances to bolster his *Batson* challenges is ineffective and unpersuasive under AEDPA. *Cf. Davis*, 576 U.S. at 274–75 (explaining that a state court determination that a prospective juror's "views on the death penalty were alone sufficient . . . to exercise a strike" is due deference under (d)(2)).

Accordingly, Mr. Sharp has not satisfied his (d)(2) burden for *Batson* relief based on stricken Jurors No. 64, 74, 38, 47, 39, 52, 11, and 27, and he has not proven that an "extreme malfunction[]" occurred in his state criminal proceedings because of an egregious *Batson* violation. *Harrington*, 562 U.S. at 102 (cleaned up).

### B. *Hurst* Claim

In Claim II, Mr. Sharp asserts that his Alabama death sentence is unconstitutional based on *Hurst v. Florida*, 577 U.S. 92 (2016). Doc. 14 at 102. In *Hurst*, the Supreme Court invalidated Florida's capital-sentencing structure on Sixth Amendment grounds. 577 U.S. at 102–03. Warden Raybon asserts that Mr. Sharp cannot rely on *Hurst* because it does not apply retroactively. Doc. 21 at 43 ¶ 108. The court first discusses *Hurst* and then analyzes retroactivity.

Under the Florida law at issue in *Hurst*, "the maximum sentence a capital felon [could] receive [from] the conviction alone [wa]s life imprisonment." *Hurst*, 577 U.S. at 95. A Florida jury found the defendant guilty of "premeditated murder[—a capital felony—] . . . for an unlawful killing during a robbery" over a lesser charge of felony murder. *Id.* "A penalty-phase jury recommended [7 to 5] that [the] judge impose a death sentence," and "[t]he judge independently agreed." *Id.* at 94, 96. The Supreme Court concluded the petitioner's death sentence violated his "right to an impartial jury," *id.* at 102, because "the maximum punishment [the petitioner] could

have received without any judge-made findings was life in prison without parole," *id.* at 99. The Court clarified that "[a] jury's mere recommendation" in favor of the death penalty "is not enough" to satisfy the constitutional requirement that "a jury, not a judge, . . . find each fact necessary to impose a sentence of death." *Id.* at 94; *see also id.* at 102.

When Mr. Sharp received his death sentence, Alabama's capital punishment structure was similar, but not identical, to the approach invalidated in *Hurst*. Like Florida, the jury played an advisory role in the penalty phase in Alabama. Doc. 19-23 at 60. Unlike Florida, Alabama required a unanimous jury determination of an aggravating factor beyond a reasonable doubt in the guilt phase as a prerequisite to a judge-imposed death sentence. *See Ex parte Bohannon*, 222 So. 3d 525, 532 (Ala. 2016) ("[I]n Alabama a jury, not the judge, determines by a unanimous verdict the critical finding that an aggravating circumstance exists beyond a reasonable doubt to make a defendant death-eligible . . . .").

But Mr. Sharp cannot rely on *Hurst* to support habeas relief. Temporally, the Supreme Court decided *Hurst* after the conclusion of Mr. Sharp's direct review proceedings and his Rule 32 petition. Doc. 19-49 at 3; Doc. 19-50 at 2; Doc. 19-52 at 124. Mr. Sharp did not assert a *Hurst* sentencing challenge until he petitioned this court for habeas relief. Ordinarily, to protect final judgments, a habeas petitioner

may not rely on a new constitutional rule of criminal procedure to contest a sentence collaterally. *Teague v. Lane*, 489 U.S. 288, 310 (1989) (plurality opinion). A small subset of "substantive rules" operate without such a restriction. *Schriro v. Summerlin*, 542 U.S. 348, 352 n.4 (2004). But *Hurst* does not fall within that subset. Accordingly, both the Supreme Court and the Eleventh Circuit have held that "*Hurst* do[es] not apply retroactively on collateral review." *McKinney v. Arizona*, 589 U.S. 139, 145 (2020) (citing *Schriro*, 542 U.S. at 358); *see also Lambrix v. Sec'y, Fla. Dep't of Corr.*, 851 F.3d 1158, 1165 n.2 (11th Cir. 2017) ("*Hurst* . . . is not retroactively applicable on collateral review.").

### C. Unconstitutional Sentence

Mr. Sharp also contends that his death sentence is unconstitutional under the Eighth Amendment. Doc. 14 at 112. Mr. Sharp bases this claim on the court's finding during the sentencing hearing that "the cruelty, atrociousness and heinousness of th[e] crime in and of itself . . . outweigh[ed] any mitigating circumstances." Doc. 19-20 at 77; Doc. 14 at 112 ¶ 443 (emphasis omitted). The context of this sentencing remark included those mitigating factors which Mr. Sharp contended existed but the court found lacking. Doc. 19-20 at 77; Doc. 14 at 112 ¶ 443. Warden Raybon counters that the claim fails on procedural grounds because Mr. Sharp failed to

exhaust the claim in the Alabama courts "on direct appeal or collateral review." Doc. 22 at 157.

The court has reviewed Mr. Sharp's briefing on direct and collateral appeal for evidence that he presented this claim. Starting with direct review in the Alabama Court of Criminal Appeals, Mr. Sharp did not base an assertion of reversible error on the trial court's finding that the aggravating evidence was stronger than the proven factor of an insignificant criminal history plus any other alleged mitigating circumstances. *See* Doc. 19-23 at 59–60 (explaining mitigation findings). The only mitigation claim Mr. Sharp raised in his first appellate brief was that the circuit court failed to consider "the extreme mental disturbance that [he] was under due to the abuse he suffered as a child." Doc. 19-44 at 2, 4–5, 38–40. Mr. Sharp's second and third briefs focused exclusively on his *Batson* challenge. Doc. 19-47 at 2–4, 7–8; Doc. 19-49 at 3–7, 10–11. Then, in his first petition for a writ of certiorari to the Alabama Supreme Court, Mr. Sharp argued that the trial court's failure to address the "unrebutted mitigati[ng] evidence" of "his history of anxiety, depression, bipolar disorder, and self-medication through the use of illegal drugs" was reversible error. Doc. 19-45 at 2, 82–84. His petition did not assert the alleged error that he now pursues on habeas review—the finding that the aggravating nature of the rape-murder outweighed all mitigating factors. Mr. Sharp's second and third petitions to

85

the Alabama Supreme Court, like his later briefs on direct appeal, address only his *Batson* claim. Doc. 19-48 at 101–51; Doc. 19-50 at 2–52.

Thus, Mr. Sharp did not present on direct appeal the Eighth Amendment argument he relies on now. Mr. Sharp did not exhaust the claim postconviction either. Doc. 19-54 at 2, 4–6; Doc. 19-55 at 94–96. Mr. Sharp is now silent about his failure to comply with the exhaustion requirement. Doc. 27 at 23. Mr. Sharp makes no attempt to excuse this default through cause and prejudice. Consequently, the procedural default rule forecloses Mr. Sharp's reliance on Claim III to obtain habeas relief.

### D. *Strickland* Mitigation Claim

Mr. Sharp asserts that trial counsel provided ineffective assistance in the sentencing phase by failing to present relevant mitigating evidence. Doc. 14 at 113–15. According to Mr. Sharp, "trial counsel failed to present evidence that he was a model inmate . . . in the Madison County Jail" for "nearly seven years" as he awaited trial. *Id.* at 113 (emphasis omitted). Mr. Sharp raised this issue in his Rule 32 petition and on collateral appeal. Doc. 19-52 at 124, 151–52 ¶¶ 114–16; Doc. 19-54 at 2, 52–53. The circuit court dismissed the claim for deficient pleading under Alabama Criminal Procedure Rules 32.3 and 32.6(b). Doc. 19-53 at 90. Specifically, the court found that Mr. Sharp had failed to identify the witnesses that would have testified

on his behalf, allege the substance of their anticipated testimony, or explain "how such testimony would have changed the results of the penalty phase." *Id.* The Court of Criminal Appeals agreed and observed that the decision whether to  present evidence of Mr. Sharp's good behavior in prison was within counsel's discretion, not mandatory. Doc. 19-55 at 47, 84.

Warden Raybon relies on *Borden v. Allen*, 646 F.3d 785 (11th Cir. 2011), and the deferential framework of Section 2254(d) to defend this claim. Doc. 22 at 160–61 & n.511. In *Borden*, the Eleventh Circuit concluded that a Rule 32 dismissal of a collateral claim for insufficient pleading is a merits-based ruling under AEDPA. 646 F.3d at 812.

Mr. Sharp replies that after *Martinez*, *Borden*'s "continued viability . . . is questionable." Doc. 27 at 25. The *Martinez* Court held, "as an equitable matter," that ineffective assistance of counsel could serve as cause to excuse procedural default of an unexhausted claim under limited circumstances. 566 U.S. at 14. But the Court did not discuss whether a state court dismissal based on a rule regarding inadequate pleading qualifies as a merits-based decision under AEDPA. *Borden* remains good law and is binding on this court. *See, e.g.*, *Boyd v. Comm'r, Ala. Dep't of Corr.*, 697 F.3d 1320, 1331 (11th Cir. 2012) (relying on *Borden*'s Rule 32.6(b) holding post-*Martinez*).

*Borden* leaves no room for doubt that the Alabama courts adjudicated this *Strickland* mitigation claim on the merits. Because the substantive decision in state court triggers Section 2254(d), this court cannot grant relief unless Mr. Sharp overcomes AEDPA deference under (d)(1) or (d)(2).

Mr. Sharp argues that he satisfies (d)(1) because the Alabama Court of Criminal Appeals applied *Strickland* unreasonably. Doc. 27 at 25. According to Mr. Sharp, the Court of Criminal Appeals "could not have reasonably determined whether counsel w[ere] ineffective . . . under either prong" because the evidence supporting that claim was unknown. *Id.* This echoes the circuit court's affirmed rationale for dismissing the collateral claim—that Mr. Sharp did not allege enough about the unpresented model-prisoner information to establish *Strickland* prejudice. Doc. 19-53 at 90.

To establish that the Court of Criminal Appeals applied *Strickland* unreasonably, Mr. Sharp must identify contextually relevant Supreme Court holdings that support a favorable resolution of his claim. Without precedents with factual similarities, Mr. Sharp cannot demonstrate objective unreasonableness—a constitutionally wrong state court rejection of his claim that is obvious and "beyond . . . fairminded" debate. *See Harrington*, 562 U.S. at 103.

Mr. Sharp's reliance on *Strickland* falls short. The new evidence of mitigation in *Strickland* was far more detailed than Mr. Sharp's unpresented mitigation evidence. The *Strickland* evidence included "14 affidavits from friends, neighbors, and relatives," who would have been willing to testify as favorable character witnesses. 466 U.S. at 675. The Court nevertheless rejected the ineffective assistance claim. *Id.* at 699–700 (concluding that the claim "fail[ed]" "doubl[y]"—under both the deficient performance and prejudice prongs). After explaining why counsel's performance was not deficient, the *Strickland* Court commented that the claim's "lack of merit" was "even more stark" under the prejudice prong because the omitted mitigating evidence "would barely have altered the sentencing profile presented to the sentencing judge" and did not establish a reasonable probability of a different sentencing outcome. *Id.*

The state court adjudication that Mr. Sharp's good behavior allegations lacked specificity to show actionable penalty-phase prejudice was not an unreasonable application of *Strickland*. The court cannot simply say that Mr. Sharp's vague allegations about evidence of his good behavior in custody (based on unknown witnesses with unknown anticipated testimony) "paint[] a vastly different picture of his background than" the mitigating information his stepmother and sister provided

about his relationship with his daughter and the "tumultuous" childhood he endured. *Williams v. Allen*, 542 F.3d 1326, 1342 (11th Cir. 2008); Doc. 19-19 at 77, 81.

## IV.   Mr. Sharp's Request for an Evidentiary Hearing and Discovery

Mr. Sharp has not established an entitlement to habeas relief based on his allegations of constitutional error in his capital conviction and sentence. Consequently, the court will not hold an evidentiary hearing or allow discovery. *See Allen v. Sec'y, Fla. Dep't of Corr.*, 611 F.3d 740, 763 (11th Cir. 2010) ("Having alleged no specific facts that, if true, would entitle him to federal habeas relief, [the petitioner] is not entitled to an evidentiary hearing."); *see also Cullen v. Pinholster*, 563 U.S. 170, 182, 184 (2011) ("[l]imiting [Section] 2254(d)(1) review to the state-court record" and precluding consideration of "evidence later introduced in federal court [a]s irrelevant" to the habeas analysis).

## V.   Conclusion

For the reasons stated above, this court finds that Mr. Sharp's claims and request for an evidentiary hearing and discovery are due to be denied, Doc. 14 at 115–16, and his Section 2254 petition is due to be dismissed. This court will enter a Final Judgment dismissing Mr. Sharp's Amended Petition for a Writ of Habeas Corpus, Doc. 14, contemporaneously with this Memorandum Opinion.

Under Rule 11(a) of the Rules Governing Section 2254 Cases in the United States Courts, this court must issue or deny a certificate of appealability when it enters a final order adverse to the habeas petitioner. This court may issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make such a showing, a "petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Slack v. McDaniel*, 529 U.S. 473, 484 (2000), or that "the issues presented were adequate to deserve encouragement to proceed further," *Cockrell*, 537 U.S. at 336 (cleaned up). For claims rejected without reaching the merits, a petitioner must demonstrate that reasonable jurists would debate whether "the petition states a valid claim of the denial of a constitutional right" and "the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484.

The court finds that Mr. Sharp's claims do not satisfy these standards for granting a certificate of appealability. Accordingly, this court will deny Mr. Sharp a certificate of appealability in the Final Judgment entered contemporaneously herewith.

**DONE** and **ORDERED** this 15th day of October, 2024.

**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE